DBHL, INC. and Dearborn HL, S. de R.L. de C.V., Appellants,

v.

MOEN INCORPORATED and Moen Sonora S.A. de C.V., Appellees.

No. 01–08–00046–CV.

Court of Appeals of Texas, Houston (1st Dist.).

June 25, 2009.

Marcus R. Tucker, Royston, Rayzor, Vickery & Williams LLP, Melissa Ann Mihalick, Nicole B. James, Spencer L. Edwards, The Hudgins Law Firm, Houston, TX, for Appellants.

Tonja De Sloover, Thomas C. Godbold, Fulbright & Jaworski L.L.P., Houston, TX, Amy Flaherty Hartman, David E. Koropp, Winston & Stawn LLP, Chicago, IL, for Appellees.

Panel consists of Justices BLAND, SHARP, and TAFT.*

## OPINION

JANE BLAND, Justice.

After DBHL, Inc. and Dearborn HL, S. de R.L. de C.V. (DBHL) settled numerous product liability claims for damages resulting from a defective plumbing part, it sued Moen Incorporated and Moen Sonora S.A. de C.V. (Moen) for indemnification based on a Texas statute and a provision of an asset purchase agreement (APA) under which DBHL acquired a prototype of a defective part. Moen counterclaimed for indemnity for attorney's fees that it expended in connection with the underlying claims. The trial court granted summary judgment against DBHL on its statutory indemnification claim, and, after a bench trial, entered a take-nothing judgment against both DBHL and Moen on the remaining indemnification claims. DBHL appeals, contending that the evidence is not legally or factually sufficient to support

* Justice Tim Taft, who retired from the First Court of Appeals on June 1, 2009, continues to sit by assignment for the disposition of this case, which was submitted on March 24, 2009.

the trial court's findings and conclusions that (1) DBHL's losses did not result from or arise out of Moen's conduct and (2) DBHL was wholly responsible for its liability arising from the defective part, and consequently, Moen owes no contractual indemnity to DBHL. DBHL further contends that the trial court erred in dismissing DBHL's claim for statutory indemnification on summary judgment because Moen satisfies the statute's definition of "manufacturer." Finding no error, we affirm.

## Background

In December 2002, DBHL acquired Moen's specialty plumbing parts business. In addition to Moen's existing product lines, DBHL acquired prototypes of products in development, including a toilet tank part known as a "fill valve" or a "ballcock," built with a polypropylene shank rather than with the polyvinyl chloride (PVC) shank Moen primarily used to make ballcocks in its existing products.

Moen considered the change from PVC to polypropylene to be significant and, accordingly, treated the polypropylene ballcock as a new product under its standard development and testing procedures. This meant that Moen would not release ballcocks with a polypropylene shank for sale to the public until they passed rigorous testing. Before the sale to DBHL, Moen's reliability engineer devised a three-stage test plan for the polypropylene ballcock project. Moen conducted the first stage, which involved prototype testing, with custom-made samples of the product, using different tooling and manufacture methods but not the methods used to mass-produce products sold to the public.

The second and third stages of the test plan involved production part approval process (PPAP) testing—which included installation torque testing to evaluate the strength of the mounting nut—and product verification testing.[1] These two stages use samples of the product made with the same equipment and by the same method that would be used to mass produce the products for sale to the public, assuming satisfactory results. Moen, however, did not complete these testing stages before the sale to DBHL because it had not obtained the required production equipment modifications. Before the parties executed the APA, DBHL knew that the propylene ballcocks and design changes were not complete and that, before DBHL could consider releasing the polypropylene ballcocks to the public, it would have to, among other things, obtain production tooling, conduct production part approval process testing on actual samples, and pass all required code compliance testing.

As part of the sale of the business, Moen gave DBHL its files containing the test plan. At that point, DBHL assumed sole responsibility and control for going forward with the polypropylene ballcock project Moen had initiated. DBHL decided to proceed with development and commercial production without reviewing any of the testing results Moen had previously provided to it. From the December 2002 sale closing date until August 2003, DBHL continued to sell the PVC ballcocks that Moen had been selling, but continued to develop the polypropylene ballcocks, without input from Moen, including making its own design decisions and obtaining and approving production tooling. DBHL deviated from Moen's testing protocol: it released the polypropylene ballcocks for

---

1. Moen conducted installation torque testing on all products with threaded attachments. The test involves inserting each sample into a hole in a test plate, installing a mounting nut on the threading, then twisting the mounting nut down on the sample until it fails.

commercial sale in September 2003 without having conducted any of the planned installation torque testing on them.

DBHL sold the ballcocks primarily to original equipment manufacturers (OEMs). By December 2003, DBHL began to receive reports from one of the OEMs that its polypropylene ballcocks were failing in unprecedented numbers, and specifically, that the new shank attached to the ballcock was breaking during assembly.

Based on these reports, DBHL decided to immediately modify the ballcocks by thickening the shank, but did not remove the product from the market. By early March 2004, however, DBHL began to receive more reports that the polypropylene ballcocks were failing in the field. Such a failure was catastrophic in the sense that it caused water to overflow from the toilet, potentially resulting in substantial damage to the end users' property.

DBHL removed the polypropylene ballcocks from the market in May 2004, after it had sold approximately 1.6 million of them.

The OEMs sued DBHL to recover the payments they had made to settle their customers' property damage claims, and they sought to hold DBHL liable under various theories, including strict liability, negligence, defective design, and failure to warn. The OEMs alleged that DBHL was negligent with respect to the design, manufacture, quality, testing, and/or sale of the ballcocks, negligent in its failure to notify customers of prior complaints about the ballcocks, and negligent in its failure to properly investigate complaints about the ballcocks. The OEMs also brought claims for breach of contract, and breach of express and implied warranties, arising out of DBHL's alleged failure to provide a product that conformed to the requirements of DBHL's contracts with the OEMs, and, in two of the complaints,

claims that DBHL intentionally misrepresented that the polypropylene ballcock was an improved product and that it had been adequately researched, certified, and tested.

DBHL reached a settlement with the OEMs and resolved those cases by paying the OEMs approximately $27 million. In settling the OEM claims, DBHL named Moen as a "released party" in the settlement agreements, but reserved its rights to sue Moen "based on contribution, indemnity, negligence, strict liability, breach of contract or any other theory of recovery, legal, equitable, or otherwise." The OEMs agreed to "cooperate reasonably" in DBHL's effort to obtain reimbursement from Moen of the consideration paid in connection with the settlement, including an agreement to file suit against Moen if needed to preserve DBHL's contribution rights. DBHL then demanded that Moen indemnify it for losses caused by the ballcock failures. Moen refused, and DBHL filed this suit.

## Discussion

### I. Contractual indemnity

██ DBHL challenges the trial court's conclusion that Moen did not owe DBHL contractual indemnity, in whole or in part, as well as the legal and factual sufficiency of its findings of fact undergirding that conclusion. We first consider the scope of the parties' contractual indemnity provision in the APA in determining the propriety of the trial court's challenged rulings. Courts may not expand the parties' rights or responsibilities beyond the limits defined in an indemnity contract. *Hong Kong Dev., Inc. v. Nguyen*, 229 S.W.3d 415, 458 (Tex.App.-Houston [1st Dist.] 2007, no pet.) (citing *Ideal Lease Serv., Inc. v. Amoco Prod. Co.*, 662 S.W.2d 951, 953 (Tex.1983)). The APA declares that

Delaware law applies to its interpretation. We consider both Delaware law and, where the applicable rules do not substantially differ, Texas law, in reviewing DBHL's contractual challenge.

### A. Standard of Review

We defer to the trial court's properly supported factual findings. In an appeal from a bench trial, a trial court's findings of fact have the same weight as a jury's verdict so long as evidence exists in the record to support them. *Amador v. Berrospe,* 961 S.W.2d 205, 207 (Tex.App.-Houston [1st Dist.] 1996, writ denied). We review the sufficiency of the evidence supporting challenged findings of fact by applying the same standards that we use in reviewing the legal or factual sufficiency of the evidence supporting jury findings. *Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex.1994). We review de novo a trial court's conclusions of law and uphold them on appeal if the judgment can be sustained on any legal theory supported by the evidence. *BMC Software Belg. v. Marchand,* 83 S.W.3d 789, 794 (Tex.2002); *In re Moers,* 104 S.W.3d 609, 611 (Tex.App.-Houston [1st Dist.] 2003, no pet.).

The test for legal sufficiency is "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005). In making this determination, we credit favorable evidence if a reasonable fact-finder could, and disregard contrary evidence unless a reasonable fact-finder could not. *Id.* If the evidence falls within the zone of reasonable disagreement, then we may not substitute our judgment for that of the fact-finder. *Id.* at 822. The fact-finder is the sole judge of the credibility of the witnesses and the weight to give their testimony. *Id.* at 819. In reviewing a factual sufficiency challenge, we consider and weigh all of the evidence supporting and contradicting the challenged finding and set aside the finding only if the evidence is so weak as to make the finding clearly wrong and manifestly unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *see Plas–Tex, Inc. v. U.S. Steel Corp.,* 772 S.W.2d 442, 445 (Tex.1989).

### B. Indemnity obligations imposed by the APA

Section 9.3(a) of the APA states: Subject to *Sections 9.1* and *9.2,* from and after the Closing, Seller *shall indemnify, defend and hold harmless Purchaser* and its Affiliates (including Foreign Purchaser) and their respective directors, officers, employees and representatives (collectively, *"Purchaser Indemnitees"*) *from and against any and all claims,* demands or suits (by any Person, including any Governmental Authority), losses, liabilities, damages, fines, penalties, obligations, payments, costs and expenses, paid or incurred, whether or not relating to, resulting from or arising out of any Third Party Claim, including the costs and expenses of any and all actions, suits, proceedings, demands, assessments, judgments, settlements, and compromises relating thereto and reasonable attorneys' fees in connection therewith (collectively, *"Losses"*) (*provided,* that Losses shall not include any indirect, consequential or punitive damages of any Purchaser Indemnitee, including damages for lost profits and lost business opportunities, or any Losses to the extent reimbursed pursuant to insurance policies insuring any Purchaser Indemnitee with respect thereto or otherwise recovered from third Persons, but not excluding any portion of such Loss that would pursuant to the terms of such insurance or other arrangement ultimately be borne by any Purchaser Indemnitee relating to, resulting from or arising out of any deductible or other

like arrangement) (individually and collectively, *"Indemnifiable Purchaser Losses"*) *resulting from or arising out of any of the following:*

(i) any breach by Seller of any of the representations or warranties of Seller contained in this Agreement;

(ii) any breach by Seller or Foreign Seller of any covenant of Seller or Foreign Seller contained in this Agreement;

(iii) other than with respect to the Assumed Liabilities, *the conduct of the Business or any part thereof or the ownership, use or lease of any Asset, in each case, prior to the Closing Date;* and

(iv) any Excluded Liability.

(italics added; underscoring in original). In applying this provision to the underlying claims, the trial court found that "DBHL's losses did not result from or arise out of the conduct of Moen's business" before the closing date. DBHL challenges this finding, asserting that the trial court erroneously relied on contentions in the underlying lawsuits to determine whether DBHL's losses arose from Moen's pre-closing conduct and failed to make an independent factual determination as to whether the ballcock failures resulted from or arose out of the conduct of DBHL, Moen, or both.

■ As DBHL correctly notes, a duty to indemnify is triggered by the facts, not merely any underlying pleadings. *Tesoro Petroleum Corp. v. Nabors Drilling USA, Inc.,* 106 S.W.3d 118, 125 (Tex.App.-Houston [1st Dist.] 2002, pet. denied). But, contrary to DBHL's assertion, the trial court did not rely merely on the allegations and contentions in the underlying OEM lawsuits. Rather, the trial court made specific findings of fact concerning the events that gave rise to those lawsuits, and reached its conclusions of law by applying the APA's indemnity provision in construing the effect of those events and

each party's responsibility for them. *Accord Delle Donne & Assocs., LLP v. Millar Elevator Serv. Co.,* 840 A.2d 1244, 1249–50 (Del.2004) (applying jury findings addressing proportionate negligence allocation in determining amount of indemnity owed by each tortfeasor under reciprocal indemnity agreement).

With respect to Moen's conduct, the trial court specifically found that, (1) at the time Moen sold the business, it had not progressed beyond creating a small number of prototypes of the polypropylene ballcocks and had not completed design verification testing (findings 8, 24, 26, and 72); (2) that Moen never made any determination that the polypropylene ballcocks were ready for release to the public (findings 25, 27, and 73); and (3) Moen provided DBHL with its test plan and made DBHL aware that the polypropylene ballcocks required further testing and design modifications before they would be ready for the market (findings 21, 26, 27, 31, and 32).

The trial court found that DBHL "alone" (1) was responsible for the design of the shank threads and the decision to use pure polypropylene in manufacturing the ballcocks (findings 78 and 79); (2) decided to put the polypropylene ballcocks on the market without conducting the additional testing set forth on Moen's test plan, including the critical installation torque testing, which could have forewarned them that the polypropylene ballcocks' shank was too thin given the type and grade of polypropylene used (findings 52 and 77); (3) decided to use existing installation instructions that accompanied the PVC ballcocks without reviewing them or making any effort to determine whether they needed revision (finding 80); and (4) decided to introduce the polypropylene ballcocks into the stream of commerce without ensuring that they had been sufficiently tested (findings 74 and 75). Ultimately,

the trial court found, DBHL attributed the ballcocks' failure to the facts that: "(1) the type and grade of polypropylene chosen was not as strong as PVC; (2) the shank of the ballcock was not thick enough given the type of polypropylene used; and (3) the threads where the coupling nut attached to the toilet tank were too sharp." (finding 71)

These specific findings support the trial court's overarching determination that "[t]hese contributing factors resulted from, and arose out of, DBHL's conduct of the business after the Closing Date," and that, obversely, "DBHL's consequential damages did not arise out of, or result from, in whole or in part, Moen's conduct of the business prior to the Closing Date." (finding 71 and conclusion 106).

■ DBHL next contends that no evidence supports "the necessary finding of fact that DBHL paid to settle its own liability," and not, at least partially, Moen's. DBHL points to the settlement agreements as "the only evidence in the record," on this issue, and, according to DBHL, these agreements show that DBHL paid to settle Moen's exposure. This contention also lacks merit. As the trial court found, each of the underlying settlement agreements requires the OEM to cooperate with DBHL in its effort to obtain contribution from Moen for the settlement, and assigns to DBHL the right to pursue Moen. Thus, Moen plainly was not "released" from liability in the underlying settlements. In any event, the trial court did not limit its inquiry to the content of the release and settlement agreements in factually determining whether DBHL's losses resulted from or arose out of Moen's conduct before the closing date. Rather, its findings of fact specifically address the chronological sequence of events giving rise to the OEM lawsuits and buttress the trial court's determination that Moen was not responsible for the losses DBHL incurred based on its commercial sale of the product, which commenced after the closing. The trial court based its findings on the extensive testimony about these facts that it heard as the trier of fact.

■ DBHL finally contends the trial court erred by failing to apportion responsibility for the ballcock failures between it and Moen, despite its conclusion that Moen is responsible for its own attorney's fees, a determination Moen chose not to appeal. DBHL's contention confuses the concept of fault with the APA's definition of "loss." The APA defines "loss" as "losses, liabilities, damages, fines, penalties, obligations, payments, cost and expenses, paid or incurred, whether or not relating to, resulting from or arising out of any Third Party Claim including the costs and expenses of any and all actions, suits, proceedings, demands, assessments, judgments, settlements, and compromises relating thereto and reasonable attorneys' fees in connection therewith . . . ." Under the APA, "loss" includes attorney's fees and costs in defending against lawsuits, which is, according to the trial court's findings, the only loss incurred by Moen. But with respect to fault, the trial court found that DBHL "alone" decided to forego additional testing and, without making any design modifications or revision to the installation instructions, place the polypropylene ballcock into the stream of commerce. The record supports these findings. Consequently, we detect no fatal inconsistency between the trial court conclusion that Moen's "losses"—i.e., the attorney's fees that Moen incurred when the OEMs sued it—did not result from or arise out of DBHL's conduct after the closing date with its conclusion that DBHL alone was responsible for the polypropylene ballcock failures, and thus has no claim for contractual indemni-

ty for the losses DBHL sustained after the closing date.

The trial court's finding that DBHL was solely responsible for releasing a defective product on the market renders the case DBHL relies on, *Delle Donne and Associates, LLP v. Millar Elevator Service Co.,* factually inapposite. 840 A.2d 1244 (Del. Sup.Ct.2004). In that case, Delle Donne, a building owner and manager, and Millar, an elevator maintenance company, settled a third-party personal injury claim before trial. Millar paid $80,000 and Delle Donne paid the remainder of a $175,000 settlement. *Id.* at 1253. In a separate suit, they pursued cross-claims for contractual indemnity under reciprocal indemnity provisions. *Id.* The jury found that Delle Donne was 65% liable and that Millar was 35% liable for the injury. *Id.* The court adjusted each party's financial burden for the settlement accordingly, recognizing that an indemnitee was entitled to recover partial contractual indemnity for losses caused by the indemnitor's negligence, measured by the percentages of liability determined by a jury. *Id.* at 1253–54.

The trial court's apportionment of responsibility in this case harmonizes with the rule in *Delle Donne:* finding that the damages were wholly attributable to DBHL's conduct, the trial court imposed full responsibility on DBHL and none on Moen. Accordingly, we hold that the trial court did not err in concluding that DBHL is not entitled to contractual indemnity under the Asset Purchase Agreement.

## II. Statutory indemnity

DBHL also challenges the trial court's summary judgment ruling that DBHL is not entitled to statutory indemnity under Chapter 82 of the Texas Civil Practice and Remedies Code for its payments to the OEMs. We review a trial court's grant of partial summary judgment de novo. *Va-*

*lence Operating Co. v. Dorsett,* 164 S.W.3d 656, 661 (Tex.2005); *Provident Life Accid. Ins. Co. v. Knott,* 128 S.W.3d 211, 215 (Tex.2003). Under the standard for traditional summary judgment, the movant has the burden to show that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. TEX.R. CIV. P. 166a(c); *KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.,* 988 S.W.2d 746, 748 (Tex.1999). "When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant and indulge every reasonable inference and resolve any doubts in the nonmovant's favor." *Knott,* 128 S.W.3d at 215; *Sci. Spectrum, Inc. v. Martinez,* 941 S.W.2d 910, 911 (Tex.1997); *see Dorsett,* 164 S.W.3d at 661.

■ Section 82.002(a) of the Texas Civil Practice and Remedies Code provides that "[a] manufacturer shall indemnify and hold harmless a seller against loss arising out of a products liability action, except for any loss caused by the seller's negligence, intentional misconduct, or other act or omission, such as negligently modifying or altering the product, for which the seller is independently liable." TEX. CIV. PRAC. & REM.CODE ANN. § 82.002 (Vernon 2005). The statute defines a "manufacturer" as "a designer, formulator, constructor, rebuilder, fabricator, producer, compounder, processor or assembler of any product or any component part thereof and who places the product or any component part thereof in the stream of commerce." *Id.* § 82.001(4). Here, the undisputed evidence demonstrates that Moen had no involvement in placing the polypropylene ballcock into the stream of commerce. Because Moen cannot be a "manufacturer" without placing the product into the stream of commerce, DBHL is not entitled to statutory indemnity from Moen. Accordingly, the trial court correctly held that DBHL's statutory in-

demnification claim fails as a matter of law. *See Owens & Minor, Inc. v. Ansell Healthcare Prods., Inc.*, 251 S.W.3d 481, 482, 489 (Tex.2008) (holding that statute does not require manufacturer to indemnify against claims involving products other manufacturers released into stream of commerce).

## Conclusion

Legally and factually sufficient evidence supports the trial court's findings that (1) DBHL's losses did not result from or arise out of the conduct of Moen's business prior to the APA's closing date and (2) DBHL was wholly responsible for the losses it incurred due to its product's commercial failure. These findings support the trial court's legal conclusion that Moen owes no contractual indemnity to DBHL. Further, the trial court did not err in granting summary judgment in favor of Moen on DBHL's section 82.002 statutory indemnification claim. We therefore affirm the judgment of the trial court.