

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-20-00384-CV

———————————————————

RKI EXPLORATION & PRODUCTION, LLC, Appellant

V.

AMERIFLOW ENERGY SERVICES, LLC AND CRESCENT SERVICES, LLC,
Appellees

On Appeal from the 352nd District Court
Tarrant County, Texas
Trial Court No. 352-285144-16

Before Birdwell, Bassel, and Wallach, JJ.
Memorandum Opinion by Justice Bassel

# MEMORANDUM OPINION

## I. Introduction

This appeal involves an indemnity dispute between the operator of a wellsite—Appellant RKI Exploration & Production, LLC—and two of its contractors—Appellees Ameriflow Energy Services, LLC and Crescent Services, LLC. The relationship of the parties was governed by two Master Service Agreements (MSAs)—the RKI/Ameriflow MSA and the RKI/Crescent MSA. The provisions of those MSAs form the centerpiece of this opinion.

A piece of equipment—a sand separator—exploded at the wellsite. That accident produced multiple lawsuits filed in New Mexico by those who were injured or killed in the explosion. As will be discussed below, the lawsuits produced a maze-like series of indemnity demands, settlements, and judgments, including the settlement of one of the death cases for more than $9,000,000.

RKI challenged Ameriflow's right to indemnity by claiming that it was free from the indemnity obligation in the RKI/Ameriflow MSA because of breaches of that agreement by Ameriflow. RKI teed up that dispute in the lawsuit that resulted in the judgment underlying this appeal. Ameriflow responded by counterclaiming against RKI, and Crescent intervened to assert its right to indemnity. In general terms, RKI challenged Crescent's right to indemnity by claiming that the actions that Crescent was sued for in New Mexico were outside the scope of the performance of

the RKI/Crescent MSA and thus outside the scope of that agreement's indemnity provision.

The lawsuit below eventually generated a 10,000-page clerk's record and a series of interlocutory summary judgments, most of which were incorporated into the trial court's final judgment—a judgment awarding Ameriflow and Crescent approximately $11,000,000. An overview of the summary-judgment rulings is that the trial court ruled that (1) RKI's claims—that Ameriflow had breached the MSA between it and Ameriflow—did not free RKI from an obligation to indemnify Ameriflow and (2) Crescent is entitled to indemnity because the RKI/Crescent MSA's indemnity provision, construed broadly, reaches beyond performance of work done under the MSA to also include matters such as "activities reasonably incident [to] or anticipated" in the activity of oil-well operations.

In three issues, RKI attacks the trial court's ruling on a broad range of fronts—the primary one of which is that the trial court erred in its construction of the indemnity provision in the RKI/Crescent MSA. But RKI leaves unchallenged the trial court's ruling that it owed indemnity to Ameriflow, no matter the claim that Ameriflow breached its MSA. Instead, RKI's other primary attack focuses on the damages that Ameriflow and Crescent recovered and argues that because RKI owed no indemnity to Crescent and because Ameriflow and Crescent's proof of damages was unsegregated between the two, their proof of damages fails.

3

We agree with the core argument raised by RKI—that the trial court interpreted the RKI/Crescent MSA too broadly. With respect to Ameriflow and Crescent's effort to prove their damages jointly, they do not challenge the basic principle that they should have segregated their damages but make a host of arguments why, even if a duty to segregate exists, they are still entitled to judgment. We will examine and reject the arguments made to support that position.

Ultimately, we reverse the trial court's judgment, including various attorneys' fee awards, and remand this matter to the trial court.

## II. Factual and Procedural Background

### A. We set forth the underlying relationship of the parties.

RKI operated an oil well in Loving County, Texas. For the operation of the oil well, RKI engaged various contractors, including Ameriflow, Crescent, and others.

The relationships between RKI and those it engaged were defined by their MSAs.[1] The MSAs defined the scope of the parties' work and, central to this controversy, contained indemnity provisions. Though this description hardly captures the parties' clashing contentions on how we should interpret the MSAs, the MSAs provided for indemnity for illness, bodily injury, death, and property-damage claims with the parties owing indemnity for claims made by indemnitor's employees and contractors. The primary bone of contention is the phrase within each MSAs'

---

[1]There were MSAs other than the two that are at issue here, but we need not detail those because they involve other contractors that are not involved in this appeal.

4

indemnity provision delimiting its scope to matters "arising in connection herewith." For reasons that we will explore in detail below, RKI argues that the MSA provides that the scope of the work envisioned by the MSA is defined by work orders issued pursuant to its terms and that the scope of the indemnity the MSA provides goes no further than that scope of work. Crescent argues for a broader interpretation, requiring indemnity that "encompass[es] all activities reasonably incident [to] or anticipated by the principal activity of the MSA, which is oil well operation."

No one disputes that under the terms of the RKI/Ameriflow MSA, Ameriflow provided to the wellsite a sand separator that caused the accident, which spawned the indemnity claims that are at the heart of the parties' litigation. But relying on its narrower construction of the indemnity provision in the RKI/Crescent MSA, RKI asserts that it owed no indemnity to Crescent because the only work orders issued under the RKI/Crescent MSA required Crescent to provide a boom lift and light tower to the wellsite, and those pieces of equipment were not involved in the accident.

**B.    An explosion occurs at the wellsite that prompts the filing of various lawsuits in New Mexico.**

In 2014, the explosion of the sand separator killed Amos Ortega Sr. and Roberto Magdaleno. Three other individuals—Jesus De La Hoya, Humberto Medina, and Arturo Ruiz—were injured in the explosion.

Three lawsuits were filed in New Mexico as a result of the explosion. Mr. Magdaleno's survivors filed a suit that alleged acts of negligence against RKI, Crescent, Ameriflow, and others. It was alleged that Crescent had committed acts of negligence that were a cause of the explosion; such negligent acts generally included the provision of safety training and management to Ameriflow. The boom lift and light tower provided by Crescent were not implicated in the explosion. The same was generally true of the allegations in the wrongful-death suit filed by Mr. Ortega's survivors and the injury suit filed by Messrs. De La Hoya, Medina, and Ruiz.

The Ortega wrongful-death suit was settled, and the claims against RKI, Crescent, and Ameriflow were included in the settlement.

The De La Hoya suit was settled and the claims against RKI, Crescent, and Ameriflow were dismissed.[2]

Ameriflow and Crescent jointly settled the claims in the Magdaleno suit. But that settlement did not include RKI. RKI tried the case, and the trial resulted in a verdict that RKI was negligent but that its negligence was not the proximate cause of Mr. Magdaleno's death. The New Mexico trial court entered a take-nothing judgment with respect to RKI.[3]

---

[2]Messrs. Magadaleno and De La Hoya worked for another subcontractor on the site—Maverick Services.

[3]A later arbitration award in a legal-malpractice claim against the counsel representing the Magdaleno family estimated that a verdict of $10 million should have been returned absent the malpractice and attributed 50% of the fault to RKI.

## C. The New Mexico suits prompt indemnity demands between the parties.

The suits filed in New Mexico prompted the parties to make demands for indemnity. One of those demands resolved itself: Mr. Ortega had been an employee of Ameriflow at the time of the explosion, and relying on the provisions of the RKI/Ameriflow MSA, RKI's carrier tendered the complete defense and indemnity of the Ortega suit to Ameriflow. Ameriflow apparently accepted the tender. As noted above, the suit was settled, and the order dismissed any claims in the Ortega wrongful-death suit against RKI. As noted below, RKI sued in the present suit seeking damages relating to the Ortega suit, but no claim for indemnity between RKI and Ameriflow arising from the Ortega suit is part of this appeal.

With respect to the De La Hoya suit, when it was filed, Ameriflow made a demand on RKI for defense and indemnity. Later, when the three plaintiffs in that suit made a collective settlement demand to Ameriflow and Crescent for $12,000, a second demand for indemnity was made on RKI by Ameriflow and Crescent. RKI accepted the tender with respect to Ameriflow but not Crescent and indicated that it would move forward with settlement negotiations on Ameriflow's behalf. However, the tender reserved the right to seek monies expended on Ameriflow's behalf by RKI as a measure of damages in the litigation between the two. The De La Hoya suit was eventually dismissed as to all defendants, with RKI's obtaining releases of the claims against Ameriflow and Crescent in that suit. As explained below, a small portion of

the damage award against RKI in this suit represents attorneys' fees and expenses that Ameriflow and Crescent claim were related to the De La Hoya suit and were not paid by RKI.

The indemnity claims arising from the Magdaleno suit were not resolved while that litigation was in process, and the indemnity issues spawned by that suit form the lion's share of the issues in this appeal. Ameriflow sought indemnity from RKI by tendering its defense of the claims in that suit to RKI. RKI responded by asserting that Ameriflow had breached the RKI/Ameriflow MSA and requested that Ameriflow "release its claims for defense, indemnity, and additional insured status in return for RKI's agreement to release its claims based upon the foregoing breaches."

Later, RKI's carrier tendered a defense and indemnity to Ameriflow but reserved "all rights under its insurance policies and at law[] to pursue Ameriflow for breach of contract, breach of express and implied warranties[,] and other similar violations of the terms of the MSA to recover amounts paid out, whether on behalf of RKI or Ameriflow, in any of the lawsuits that were generated because of the explosion incident." Ameriflow challenged the carrier's attempt to reserve those rights and then reserved its rights to pursue the carrier and RKI for various claims. In turn, RKI responded that Ameriflow had rejected the carrier's offer, and RKI rejected what it viewed as a counteroffer by Ameriflow. The response also challenged what the carrier viewed as Ameriflow's unilateral efforts to settle the Magdaleno suit.

8

Crescent also demanded indemnification from RKI for the claims made against it in the Magdaleno suit and re-urged that demand when it did not receive a response to its initial demand. RKI's carrier's initial response to Crescent's demand raised the issue that Crescent had not been performing work pursuant to the terms of the RKI/Crescent MSA at the time of the explosion:

> My understanding from our investigation is that while RKI had done some work with Crescent Services, LLC prior to the loss, there were no work orders issued by RKI to Crescent to perform any tasks for them on the date of the accident and at the subject well[]site. It appears that Crescent's presence in the lawsuit is due to allegations beyond any duties it was hired by RKI to perform.

In later correspondence, the carrier reiterated its position: "Regarding the tender of Crescent Services, LLC, we do not see any evidence that RKI owes contractual defense/indemnity for the reasons previously explained to their defense counsel . . . ."

As noted, a settlement of the Magdaleno suit was eventually reached that resulted in the dismissal of the claims against Ameriflow and Crescent but not RKI; however, RKI prevailed at trial against the Magdaleno claims.

**D.  RKI sues Ameriflow claiming that Ameriflow had breached the RKI/Ameriflow MSA; Ameriflow and Crescent countersue, claiming that RKI owed them indemnity.**

Within days after RKI's carrier made its conditional tender of defense and indemnity to Ameriflow, RKI sued Ameriflow in the suit below. RKI claimed that the allegations made in the Magdaleno, Ortega, and De La Hoya suits established that Ameriflow had breached its obligations created by the RKI/Ameriflow MSA and by

9

the various express and implied warranties contained in it. RKI later sought declaratory relief that

> all monies paid out in defense costs, indemnity, and/or settlement in the Magdaleno and De La Hoya [s]uits[,] as well as all unpaid defense costs incurred in the Ortega [s]uit, are proper measures of damages that may be recoverable in the present suit if RKI establishes there was a breach of contract and/or warranty.

In its petition seeking declaratory relief, RKI continued to allege causes of action for breach of contract and breach of express and implied warranties.

In turn, Ameriflow countersued alleging that RKI had failed to fulfill its indemnity obligations under the RKI/Ameriflow MSA and sought various declarations, including "a declaration that the MSA does not provide for conditional tenders of defense and indemnification." Ameriflow later expanded on its claims, alleging that breaches of the MSA by RKI had caused the explosion that produced the Magdaleno, Ortega, and De La Hoya suits and also asserting equitable claims for equitable subrogation, unjust enrichment, and promissory estoppel, as well as attorneys' fees.

Crescent joined the suit by intervening. Crescent claimed that the RKI/Crescent MSA entitled it to indemnity, alleged the various equitable claims that Ameriflow had alleged in its counterclaim, and sought relief with respect to RKI's failure to defend and indemnify Crescent in the Magdaleno and De La Hoya suits. Crescent later supplemented its petition, alleging that RKI had breached the

10

RKI/Crescent MSA by failing to defend and indemnify Crescent for the claims in the Ortega suit.

**E. The trial court resolves the parties' various claims by summary judgments.**

The record contains a host of motions for summary judgment and amendments to those motions. Numerous interlocutory summary-judgment orders were entered, and the trial court's final judgment referenced six of those interlocutory orders.

To chart the issues resolved by the interlocutory orders and how the parties' contentions have been winnowed down on appeal, and thus our understanding of which rulings are in play, we will quote the recitals of the final judgment listing the various interlocutory orders. We will then describe what issues were raised in the summary-judgment motions resolved by those orders and whether the issues raised in those motions are in play in this appeal:

1. "On August 28, 2018[,] and May 22, 2019, respectively, this [c]ourt entered summary[-]judgment orders granting **AMERIFLOW's** and **CRESCENT's** motions for summary judgment on all their liability claims against **RKI**."

    -Ameriflow's motion for summary judgment contended that it was entitled to a declaratory judgment that RKI had breached the RKI/Ameriflow MSA by not providing indemnity to Ameriflow in the

11

Magdaleno and De La Hoya suits in accordance with the MSA, by imposing impermissible conditions on its indemnification offer, by suing Ameriflow with respect to the Ortega lawsuit, and by virtue of various equitable theories.

-On the question of whether RKI owed Ameriflow indemnity for the Magdaleno and De La Hoya lawsuits, RKI raises no appellate issue challenging that determination.

-With respect to Crescent, the quoted recital from the final judgment references Crescent's second traditional motion for summary judgment. That motion asserted that based on the trial court's prior construction of the MSA to the facts, Crescent had a right to indemnity from RKI for the claims made in the Magdaleno and De La Hoya suits. The prior construction was included in an earlier ruling on a summary-judgment motion filed by RKI; as we have noted, the trial court broadly construed the "arising in connection herewith" language of the indemnity provision in the RKI/Crescent MSA to mean that it "encompasse[d] all activities reasonably incident [to] or anticipated by the principal activity of the MSA, which is oil well operation."

-Whether the trial court properly construed the RKI/Crescent MSA to create the indemnity right that Crescent claims is hotly contested and is the pivotal issue in this appeal.

2.  "On July 27, 2017[,] and August 28, 2018, this [c]ourt entered [o]rders [d]enying [s]ummary [j]udgment on all **RKI's** requested relief against **AMERIFLOW**."

> -The issues raised by the summary-judgment orders referenced in this paragraph involve (1) RKI's summary-judgment motion that various monies that RKI had paid out in defense of the Magdaleno, Ortega, and De La Hoya lawsuits were proper measures of damages in its claims against Ameriflow and (2) Ameriflow's summary-judgment motion asserting that the various legal theories alleged by RKI did not invalidate Ameriflow's indemnity right.
>
> > -In essence, these summary-judgment orders decreed that RKI could not recover on its suit against Ameriflow, and RKI raises no issue on appeal challenging said orders.

3.  "On May 22, 2019, this [c]ourt entered an [o]rder [d]enying **RKI's** [m]otion for [s]ummary [j]udgment against **CRESCENT** on indemnity."

> -This paragraph references RKI's second motion for summary judgment that contended that Crescent's indemnity claim fell outside of the RKI/Crescent MSA because RKI had no control over work done by Crescent for Ameriflow and was not covered by the language of the indemnity provision in the RKI/Crescent MSA.

-Again, whether the RKI/Crescent MSA creates an indemnity right to Crescent is hotly contested and is the pivotal issue in this appeal.

4.    "On July 22, 2020, this [c]ourt entered a summary[-]judgment order granting **AMERIFLOW's** and **CRESCENT's** [t]hird [a]mended [m]otion for [s]ummary [j]udgment on all their claimed damages."

-Ameriflow and Crescent's third amended motion for summary judgment on damages was predicated on the trial court's prior judgment establishing that RKI was liable to both Ameriflow and Crescent. The motion contended that Ameriflow and Crescent had the right to recover the damages under the terms of the MSAs, as mitigation damages, and under equitable principles. The motion sought—and the trial court's final judgment incorporating the ruling on the third amended summary-judgment motion awarded—the following types of damages:

- Awards made to Ameriflow and Crescent jointly:
  - $9,100,000 plus prejudgment interest for the Magdaleno settlement payment;
  - $209,669.30 plus prejudgment interest for Ameriflow's and Crescent's attorneys' fees and expenses incurred in the Magdaleno lawsuit;

14

- $7,400 plus prejudgment interest for storage costs in the Magdaleno lawsuit;

- $20,041.58 plus prejudgment interest for Ameriflow's and Crescent's attorneys' fees and expenses in the De La Hoya lawsuit;

- Conditional attorneys' fees of $50,000 for an appeal, $25,000 for a petition for review, and $50,000 for briefing and argument in the Texas Supreme Court; and

- $336 in court costs;

- A fee award to Ameriflow of $254,311.62 for its attorneys' fees in the suit below (styled in the final judgment as the "*RKI v. Ameriflow* (Ft. Worth lawsuit)");

- A fee award to Crescent of $131,623.48 for its attorneys' fees in the suit below (styled in the final judgment as the "*Crescent v. RKI* (Ft. Worth lawsuit)").[4]

-RKI raises various issues on appeal challenging the grant of the joint third amended motion for summary judgment on damages and the quantification of damages in the final judgment:

---

[4]The fee awards in the Magdaleno and De La Hoya suits included pre- and post-judgment interest.

-RKI argues that any award to Crescent for amounts paid in settlement or attorneys' fees are invalid because RKI has no indemnity obligation to Crescent;

-Though the issue of whether Ameriflow is entitled to indemnity has now dropped out of the case, RKI challenges the proof relied on by Ameriflow and Crescent because there is no segregation between a party to whom it owes indemnity—Ameriflow—and a party to whom it does not owe indemnity—Crescent—of the amount paid by Ameriflow and Crescent to jointly settle the Magdaleno suit or for the fees claimed jointly that were paid in defense of the Magdaleno and De La Hoya suits;

-RKI further contends that Ameriflow offered only conclusory summary-judgment proof that the settlement amount paid in the Magdaleno suit was made in good faith and was reasonable and prudent;

-RKI next challenges what it contends are deficiencies in the proof underlying the attorneys' fee awards made to Ameriflow and Crescent for

16

defense of the Magdaleno and De La Hoya claims and for those incurred in the present suit because Ameriflow's fee claim for defense of the Magdaleno suit included fees charged for defense of the separate Ortega suit; and

-RKI finally claims that there is legally insufficient proof of appellate attorneys' fees.

### III.  Analysis

#### A.    We set forth a summary of our ultimate resolution of the appeal.

To chart what follows, our resolution of this appeal concludes that (1) the trial court erred in its construction of the indemnity provision of the RKI/Crescent MSA; (2) though we disagree with the trial court's construction, the record does not permit us to resolve the question of whether Crescent is entitled to indemnity as a matter of law; (3) the arguments made by Ameriflow and Crescent—that no matter the construction placed on the RKI/Crescent indemnity provision, they may recover the damages awarded in the judgment—are not persuasive; and (4) because of our resolution of the issues that precede the question of the validity of the fee awards, we reverse and remand those fee awards for reconsideration in light of our holdings.

#### B.    We set forth the standard of review.

In a summary-judgment case, the issue on appeal is whether the movant met the summary-judgment burden by establishing that no genuine issue of material fact

17

exists and that the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We review a summary judgment de novo. *Travelers Ins. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010).

We take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008); *Provident Life & Accident Ins. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). We also consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort*, 289 S.W.3d at 848. We must consider whether reasonable and fair-minded jurors could differ in their conclusions in light of all the evidence presented. *See Wal-Mart Stores, Inc. v. Spates*, 186 S.W.3d 566, 568 (Tex. 2006); *City of Keller v. Wilson*, 168 S.W.3d 802, 822–24 (Tex. 2005).

We will affirm a summary judgment only if the record establishes that the movant has conclusively proved all essential elements of the movant's cause of action (or defense, as the case may be) as a matter of law. *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979).

When both parties move for summary judgment, "each party bears the burden of establishing that it is entitled to judgment as a matter of law." *Tarr v. Timberwood Park Owners Ass'n*, 556 S.W.3d 274, 278 (Tex. 2018). If "the trial court grants one

motion and denies the other, the reviewing court should determine all questions presented" and "render the judgment that the trial court should have rendered." *Id.* In making this determination, we consider the evidence presented by both parties. *Barbara Techs. Corp. v. State Farm Lloyds*, 589 S.W.3d 806, 811 (Tex. 2019). Of course, if neither party moving for summary judgment presents evidence establishing that they are entitled to judgment as a matter of law, we must remand. *Grynberg v. Grey Wolf Drilling Co.*, 296 S.W.3d 132, 136 (Tex. App.—Houston [14th Dist.] 2009, no pet.) ("We may affirm the judgment, reverse and render a judgment for the other side if appropriate, or reverse and remand if neither party has met its summary-judgment burden.").

## C. We explain why we disagree with the trial court's conclusion on the question of the scope of indemnity owed by RKI to Crescent.

The central question that we face in this appeal is the one raised by RKI's first issue, which is whether the RKI/Crescent MSA provides for indemnity to Crescent. That question involves the specific task of interpreting the MSA's indemnity provision found in its Section 8.3 and the more general task of interpreting the entire MSA to determine the scope of the work called for by it and how the overall terms of the MSA impact the scope of indemnity owed to Crescent by RKI. We resolve this question with three holdings: (1) the trial court's interpretation of Section 8.3 was too broad because it failed to limit the scope of Section 8.3 to work performed under the MSA's terms; (2) the MSA delimits the scope of work that Crescent was to perform;

19

and (3) the overall terms of the MSA are in harmony with placing a limited scope on RKI's indemnity obligation.

### 1. The indemnity obligation in general and the typical indemnity scheme in the oil-and-gas industry

"An indemnity agreement is a promise to safeguard or hold the indemnitee harmless against either existing and/or future loss liability." *Dresser Indus. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 508 (Tex. 1993). In the oil-and-gas industry, a frequently used risk-allocation device is a "knock-for-knock" indemnity scheme, which "require[s] each party to contractually assume responsibility for injuries to its own employees and damage to its own property[] without regard to who caused the injury or how such damage occurred." *In re Deepwater Horizon*, 470 S.W.3d 452, 456 n.5 (Tex. 2015) (quoting Daniel B. Shilliday, et al., *Contractual Risk-Shifting in Offshore Energy Operations*, 81 Tul. L. Rev. 1579, 1599 (2007)); *see also Nabors Drilling USA, L.P. v. Encana Oil & Gas (USA) Inc.*, No. 02-12-00166-CV, 2013 WL 3488152, at *5 (Tex. App.—Fort Worth July 11, 2013, pet. denied) (mem. op.) (stating that "at drilling sites, employers are generally responsible for their own employees"); *Chesapeake Operating, Inc. v. Nabors Drilling USA, Inc.*, 94 S.W.3d 163, 168 (Tex. App.—Houston [14th Dist.] 2002, no pet.) (en banc op. on reh'g) ("In the standard drilling contract, [indemnity provisions] allocate costs and liability according to who hired the injured party, not who caused the accident.").

20

When properly drafted, indemnity provisions used in the oil-and-gas industry provide for pass-through indemnity. Pass-through indemnity ensures that a claim made against an indemnitee passes through to the indemnitor, such as when an employer has agreed to provide indemnity for a claim by one of its employees. As two commentators have explained,

> In order for the oil patch knock[-]for[-]knock indemnity to achieve the desired result - *i.e.* to make every party at the well[]site take sole responsibility for claims for injury to its people and damages to its property regardless of fault - the indemnity provisions of all of the contracts of every company present at the drill site must effectively "pass-through" indemnification obligations to the applicable indemnitor. A pass-through occurs when the indemnitee to an agreement is presented with a third[-]party claim, which the indemnitee is then able to extend to the indemnitor. In other words, the third[-]party claim flows through the indemnitee, often the operator, to the indemnitor, often a contractor that owns the damaged property or employs the injured person.

C. Randall King & G. Vincent Schuster, *Deconstructing the Indemnification Provision*, 2013 No. 3 Rocky Mtn. Min. L. Inst. Paper No. 3, at *3-8 (2013).

The parties may contract that a variety of claims will pass through; for example, a "method of obtaining pass-through protection is to expand the categories of persons or companies entitled to indemnity protection such that the indemnitor agrees to indemnify the indemnitee 'and its contractors and subcontractors (excluding Contractor and its subcontractors).'" *Nabors Drilling*, 2013 WL 3488152, at *5 n.5. (quoting William W. Pugh, *A Strategic Look at the Bigger Picture—Risk Allocation in Oil and Gas Operational Agreements*, 45 Rocky Mtn. Min. L. Found. J. 349, 354 (2008)).

21

Obviously, an indemnity clause must be properly drafted to accomplish a pass-through. For example, our court has previously scrutinized an indemnity provision and held that a party could not pass through an indemnity claim by one of its subcontractors to the injured plaintiff's employer when the indemnity agreement did not provide for a pass-through of that contractual claim. *Id.* at *5.

> **2.** **The text of the indemnity provision found in Section 8.3 of the RKI/Crescent MSA and the clashing interpretations of it**

Broadly, the interpretative question at issue is whether the claims made against Crescent passed through it to RKI. The central indemnity provision of the RKI/Crescent MSA found in Section 8.3 reads as follows:

> [RKI] agrees to protect, defend, indemnify[,] and hold harmless [Crescent], its subcontractors, their respective officers, directors and employees or their invitees, from and against all claims, demands, and causes of action of every kind and character without limit and without regard to the cause or causes thereof or the negligence or fault (active or passive) of any party or parties INCLUDING THE SOLE, JOINT, CONCURRENT, OR GROSS NEGLIGENCE OF [CRESCENT], any theory of strict liability, and defect of premises, or the unseaworthiness of any vessel (whether or not preexisting the date of this Agreement), arising in connection herewith in favor of [RKI]'s employees, [RKI]'s contractors (other than [Crescent] herein) or their employees, or [RKI]'s invitees on account of illness, bodily injury, death[,] or damage to property.

Stripping out the verbiage of Section 8.3 that is not germane to the parties' differing interpretations leaves us with a provision that RKI shall

> protect, defend, indemnify[,] and hold harmless [Crescent] . . . from and against all claims, demands, and causes of action of every kind and character without limit and without regard to the cause or causes thereof . . . arising in connection herewith in favor of [RKI's] employees[ or]

contractors . . . on account of illness, bodily injury, death[,] or damage to property.

The pivot point of the parties' contentions is the phrase "arising in connection herewith." Crescent predicates its argument—that RKI owed it indemnity for the claims that arose from the wellsite explosion of the sand separator—on the claim that Crescent provided safety training and management services to the company that provided the separator, Ameriflow. This position relies on the interpretation that Crescent advocated for and which the trial court adopted—that the "arising in connection herewith" phrase "encompasses all activities reasonably incident [to] or anticipated by the principal activity of the MSA, which is oil well operation." Countering, RKI contends that the work that Crescent did involving the sand separator was not done in performance of the RKI/Crescent MSA. Thus, RKI argues that "read properly, the word 'herewith' limits the operation of indemnity only to claims that 'aris[e] in connection' with the RKI/Crescent MSA." From this interpretation flows RKI's argument that "correctly interpreted, the phrase requires a causal connection between the RKI/Crescent MSA and the claims for which Crescent seeks indemnity." Looking to the plain meaning of the "herewith" phrase and other courts' interpretations, we adopt the narrower interpretation advocated for by RKI.

23

### 3. Crescent's burden to establish its indemnity claim and the principles we rely on to determine whether the indemnity provision at issue covers that claim

Crescent sought contractual indemnity and bore the burden to establish its right to indemnity. *See Sam Rayburn Mun. Power Agency v. Gillis*, No. 09-16-00339-CV, 2018 WL 3580159, at *18 (Tex. App.—Beaumont July 26, 2018, pet. denied) (mem. op.).[5] Thus, we must construe the indemnity provision at issue. To do this, "[w]e construe indemnity agreements under normal rules of contract construction" in an effort to "ascertain and give effect to the parties' intent as expressed in the contract."

_____

[5]Crescent bore the burden to prove that the indemnity agreement covered the claims that it made against RKI. Crescent brought a contractual indemnity claim. Thus, Crescent bore the burden to establish that it was entitled to indemnification under the terms of the MSA. *See Gillis*, 2018 WL 3580159, at *18 (stating that "[f]or the Trust to make the claim that it is entitled to indemnification, the Trust bears the burden to prove that the indemnity provision is applicable," meaning that "a third party has filed a claim against the Trust[] or [that] the indemnity clause expressly includes language indicating that it also applies to direct claims between the indemnitor and indemnitee"). Crescent tries to argue that this matter actually involves an exclusion from indemnity coverage—an exclusion that RKI failed to plead and thus waived. We disagree. In support of its argument, Crescent cites a case involving an indemnity agreement that provided indemnity coverage for negligence but then excluded coverage for gross negligence and willful misconduct. *See Tesoro Petroleum Corp. v. Nabors Drilling USA, Inc.*, 106 S.W.3d 118, 126 (Tex. App.—Houston [1st Dist.] 2002, pet. denied). In that circumstance, the indemnitee was put in the ticklish situation of proving that it was negligent but not so negligent as to be excluded from indemnity protection. To avoid the indemnitee's having to take contradictory positions, courts place the burden on the indemnitor to assert the exclusion as an affirmative defense. *XL Specialty Ins. Co. v. Kiewit Offshore Servs., Ltd.*, 426 F. Supp. 2d 565, 575 (S.D. Tex. 2006) (mem. op. & order), *aff'd*, 513 F.3d 146 (5th Cir. 2008). That is not the situation faced by Crescent in this case; Crescent is relying on inapposite precedent to argue that RKI waived its right to challenge whether the RKI/Crescent MSA provided indemnity to Crescent.

*Gulf Ins. Co. v. Burns Motors, Inc.*, 22 S.W.3d 417, 423 (Tex. 2000). The basic tools that we use to accomplish this task are well known:

- "[W]e must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011).

- "We begin this analysis with the contract's express language." *Id.*

- "We . . . 'presume parties intend what the words of their contract say' and interpret contract language according to its 'plain, ordinary, and generally accepted meaning' unless the instrument directs otherwise." *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 764 (Tex. 2018) (footnote omitted).

- We construe contracts "from a utilitarian standpoint bearing in mind the particular business activity sought to be served," and we "will avoid[,] when possible and proper[,] a construction [that] is unreasonable, inequitable, and oppressive." *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (quoting *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987)).

- Specific indemnity provisions control over general ones. *Sonerra Res. Corp. v. Helmerich & Payne Int'l Drilling Co.*, No. 01-11-00459-CV, 2012 WL 3776428, at *3, *7 (Tex. App.—Houston [1st Dist.] Aug. 30, 2012, pet. denied) (mem.

op.) (applying principle to construction of indemnity obligations in a drilling contract).

- "If, after the pertinent rules of construction are applied, the contract can be given a definite or certain legal meaning, it is unambiguous[,] and we construe it as a matter of law." *Frost Nat'l Bank*, 165 S.W.3d at 312.

In carrying out the goal of ascertaining the parties' intent in construing an indemnity provision, the supreme court instructs that we must not "expand the parties' rights or responsibilities beyond the limits agreed upon by them in the contract." *Yowell v. Granite Operating Co.*, 620 S.W.3d 335, 353 (Tex. 2020) (quoting *Ideal Lease Serv., Inc. v. Amoco Prod. Co.*, 662 S.W.2d 951, 953 (Tex. 1983)). "Instead, courts are to construe indemnity agreements strictly in order to give effect to the parties' intent as expressed in the agreement." *Id.*

Thus, in this appeal, our primary task is to ascertain the scope of an indemnity provision. A federal court provides the following overview of what we should strive for in accomplishing that goal:

> A contract of indemnity should be construed to cover all losses, damages, or liabilities [that] reasonably appear to have been within the contemplation of the parties, but it should not be read to impose liability for those losses or liabilities [that] are neither expressly within its terms nor [are] of such a character that it can be reasonably inferred that the parties intended to include them within the indemnity coverage.

*Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329, 333 (5th Cir. 1981).

26

#### 4. Breaking down and interpreting the indemnity provision's operative phrase—"arising in connection herewith"

As we have noted, our primary task is to construe the phrase "arising in connection herewith" in the indemnity provision at issue—Section 8.3 of the RKI/Crescent MSA. First, we break down the phrase by looking at the plain and ordinary meaning of its component words, and then we examine federal cases that construe the term as a whole.

##### a. Texas precedent that deals with variations on the theme of the word "arise"

The Texas Supreme Court has noted that the word "arise" has the following dictionary definitions:

> The term "arise" has broad meaning and includes "to originate; to stem (from)[; and] . . . [t]o result (from)," Black's Law Dictionary 129 (10th ed. 2014), and "to originate from a specified source[;] . . . to come into being[;] . . . to become operative[;] . . . to come about[;] come up[;] take place[; and] . . . to become apparent in such a way as to demand attention," Webster's Third New Int'l Dictionary 117 (2002).

*Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 308 (Tex. 2015). Though the word "arise" has a broad meaning, it still "connote[s] some causal nexus." *Id.* As the supreme court later noted, "We have held that the phrase 'arise out of' simply requires showing a causal connection or relation, which is a standard on the spectrum for establishing causation." *Yowell*, 620 S.W.3d at 353.

The cases cited in the preceding paragraph carry forward the supreme court's earlier interpretation of phrases that contain the word "arise" and catalog both the court's holdings and those of other jurisdictions:

> This Court has held that "arise out of" means that there is simply a "causal connection or relation," *Mid-Century Ins*[.] *Co.* [*of Tex. v. Lindsey*], 997 S.W.2d [153,] 156 (Tex. 1999), which is interpreted to mean that there is but[-]for causation, though not necessarily direct or proximate causation. *See McCarthy Bros. Co. v. Cont'l Lloyds Ins. Co.*, 7 S.W.3d 725, 730 (Tex. App.—Austin 1999, no pet.); *see also Admiral Ins. Co. v. Trident NGL, Inc.*, 988 S.W.2d 451, 454 (Tex. App.—Houston [1st Dist.] 1999, pet. denied). Other jurisdictions also interpret "arising out of" to exclude a proximate[-]cause requirement. *See McCarthy Bros.*, 7 S.W.3d at 729–30; *see also* 1 Rowland H. Long, The Law Of Liability Insurance § 1.24 (1991) ("The phrase 'arising out of' is not equivalent to 'proximately caused by.' . . . [']But for['] causation, *i.e.*, a cause[-]and[-]result relationship, is enough to satisfy the provision of the policy. . . .") (quoting *Mfrs. Cas. Ins. Co. v. Goodville Cas. Co.*, 403 Pa. 603, 170 A.2d 571 (1961)). Likewise, the United States Court of Appeals for the Fifth Circuit has concluded that "'[a]rising out of' are words of much broader significance than 'caused by.'" *Red Ball Motor Freight, Inc. v.* [*Emps.*] *Mut. Liab. Ins. Co.*, 189 F.2d 374, 378 (5th Cir. 1951); *see also Am. States Ins. Co. v. Bailey*, 133 F.3d 363, 370 (5th Cir. 1998).

*Utica Nat'l Ins. Co. of Tex. v. Am. Indem. Co.*, 141 S.W.3d 198, 203 (Tex. 2004) (op. on reh'g); *see also Dillon Gage Inc. of Dall. v. Certain Underwriters at Lloyds Subscribing to Policy No. EE1701590*, 636 S.W.3d 640, 644 (Tex. 2021) ("In *Utica* . . . , the [c]ourt contrasted the policy's use of 'due to' with 'arising out of' to conclude that the former must invoke 'a more direct type of causation.'" (footnote omitted)).

Opinions of the intermediate courts of appeals analyzing indemnity agreements hold that the word "arise" connotes a connection between a contract's obligations and the indemnity obligation:

28

> [T]he plain meaning of "arising from or connected with" is that [the indemnitee] must establish some nexus between [the indemnitor's] obligations under the contract and the detriment for which indemnity is sought. The nexus need not necessarily amount to direct or proximate causation. *See Utica Nat'l Ins. Co. . . . ,* 141 S.W.3d [at] 203 . . . ("'[A]rising out of' are words of much broader significance than 'caused by.'"). In fact, the Texas Supreme Court has held that "arise out of" simply means that there is "a ca[us]al connection or relation." *See id.*

*Coastal Mart, Inc. v. Sw. Bell Tel. Co.*, 154 S.W.3d 839, 845 (Tex. App.—Corpus Christi–Edinburg 2005, pet. granted, judgm't vacated w.r.m.); *see also Hensel Phelps Constr. Co. v. Royal Am. Servs., Inc.*, No. 01-16-00045-CV, 2017 WL 4682181, at *5 (Tex. App.—Houston [1st Dist.] Oct. 19, 2017, no pet.) (mem. op.) (rejecting argument that third-party's actions could produce indemnity obligation as "[t]hat contention is incompatible with the agreement's 'arising from' language because it would oblige [appellee] to provide indemnity even if its performance was not a cause or an alleged cause of the loss"); *Banner Sign & Barricade, Inc. v. Berry GP, Inc.*, No. 13-07-00596-CV, 2008 WL 4352634, at *5 (Tex. App.—Corpus Christi–Edinburg Sept. 25, 2008, pet. denied) (stating that the terms "arising out of" and "in connection with" "require only that a 'general nexus' be established between the subcontractor's obligations and the detriment for which indemnity is sought").

Thus, the term "arising" connotes a but-for causal connection between the indemnity claim provided for in the provision and something else. What the "something else" turns on is the meaning of the words "in connection herewith."

29

### b. The limitation created by the words "in connection herewith" and how we interpret those words

The breadth of the connection created by the use of the word "arise" or "arising" may be limited by additional phrases that narrow the scope of the connection created by the word "arise." *Yowell*, 620 S.W.3d at 353. "[W]hen parties narrow the scope of their rights and obligations purposefully, the [c]ourt must enforce the terms as expressed within the four corners of the contract." *Id.* Stated differently, we go in search of contextual clues to ascertain the scope of the connection; "while the phrases 'arising from,' 'with respect to,' and 'attributable to' may seem expansive out of context, the temporal limitations to which they are tied and other contextual clues necessarily narrow their scope and require no less than a substantial-factor relationship." *Plains Expl.*, 473 S.W.3d at 309.

Here, the limiting phrase is "in connection herewith." "In" is a preposition that in this context is "used as a function word to indicate limitation, qualification, or circumstance." *In*, Merriam-Webster.com, http://www.merriam-webster.com/dictionary/in (last visited June 9, 2022). "Connection" is a noun that denotes a "causal or logical relation or sequence" or a "contextual relation or association." *Connection*, Merriam-Webster.com, http://www.merriam-webster.com/dictionary/connection (last visited June 9, 2022). The phrase "in connection" ties to *Plains Exploration*'s definition of "arise" as originating from a particular source, i.e., "in connection" is a phrase pointing to the source of

origination. 473 S.W.3d at 308 (citing Black's Law Dictionary 129 (10th ed. 2014)). Or if looked at in terms of causal nexus, "in connection" signals that what comes next is the triggering event that causes something to originate.

The source of the matter arising in this case is "herewith." Black's Law Dictionary defines "herewith" as an adverb meaning "[w]ith or in this letter or document." *Herewith*, Black's Law Dictionary (11th ed. 2019). Texas case law states that "the adverb 'herewith' means in part 'with this communication' or 'accompanying this writing or document.'" *Parhms v. B & B Ventures, Inc.*, 938 S.W.2d 199, 204 (Tex. App.—Houston [14th Dist.] 1997, writ denied) (op. on reh'g) (citing Webster's Third New Int'l Dictionary 1059 (1993)).

Thus, we interpret the phrase "arising in connection herewith" to mean originating from the document or writing in which the phrase is contained.

### 5. How federal cases interpret indemnity provisions using the phrase "arising in connection herewith" or similar phrases

A body of Fifth Circuit precedent deals with the interpretation of the very phrase defining the scope of indemnity that we deal with—"arising in connection herewith" or similar phrases. We look to those cases as construction guides for the phrase at the core of this appeal.

As a preliminary matter, we discuss the parties' efforts to shy away from these precedents and why we are not timid to follow their guidance. Crescent claims that RKI raises a red herring by even discussing a central case in the area—*Fontenot v. Mesa*

31

*Petroleum Co.*—because Crescent did not rely on the case in its trial-court briefing. 791 F.2d 1207, 1214 (5th Cir. 1986). As RKI points out in its reply brief, Crescent did rely on *Fontenot* in its summary-judgment briefing. More importantly, the construction of the "arising in connection herewith" phrase adopted by the trial court in one of its summary judgments was plucked almost verbatim from the precedent that Crescent condemns RKI for addressing. Thus, the precedent played a pivotal role in the trial court's analysis and, for that reason alone, is one that we must examine.

RKI also tries to divert us from relying too heavily on *Fontenot* because of its maritime law context, explaining that "[t]he Fifth Circuit also noted that the 'realities of maritime life, particularly life aboard drilling vessels' informed its maritime indemnity jurisprudence—concerns that do not apply here. *Fontenot*, 791 F.2d at 1215[] n.8." RKI's statement is true, but it ignores that even in maritime cases, the federal courts are applying the same template for construction that we are. *Fontenot*, the case that the parties shy away from, applied the construction principle of reading the contract as a whole and not looking "beyond the written language of the contract to determine the intent of the parties unless the disputed language is ambiguous." *Id.* at 1214. Another Fifth Circuit opinion notes that "in a maritime contract, words of indemnification are given their plain meaning unless the provision is ambiguous." *Lirette v. Popich Bros. Water Transp., Inc.*, 669 F.2d 725, 728 n.11 (5th Cir. 1983) (citing *Corbitt*, 654 F.2d at 332–33). Thus, the maritime cases are performing the same task that we are—searching for the plain-language meaning of a contract's words. *See*

*Gemini Ins. Co. v. Trident Roofing Co.*, No. 3:09-CV-704-M, 2010 WL 335314, at \*3 (N.D. Tex. Jan. 22, 2010) (mem. op. & order) (relying on maritime precedent to construe exclusion in Texas insurance policy).

As described above, the phrase "arising in connection herewith" is a description of the relationship that a purported indemnity claim must bear to the underlying obligations between the parties. Several decades ago, the Fifth Circuit decided two cases that provided a short-hand construction of the phrase and contrasted why certain claims did or did not fall within the phrase's ambit.

The first case, *Fontenot*, involved an indemnity provision that contained the very "arising in connection herewith" phrase that we examine. 791 F.2d at 1213. *Fontenot* involved the claim of a drunken oil field worker who injured himself when he got off a helicopter onto an oil rig that was an intermediate fueling stop on the way to the rig where the worker was employed. *Id.* at 1210. The worker sued, and an internecine battle erupted between various contractors involved in the controversy over who was obliged to pay the worker's injury claim. *Id.* at 1209–10. One aspect of the battle was whether the oil company—which chartered the rig where the refueling occurred (and where the worker was injured) and which also contracted for drilling work with the company that employed the worker—owed indemnity to the refueling rig owner. *Id.* at 1213.

Synthesizing a long line of its authority dealing with the language of the indemnity agreement between the rig owner and the oil company, the Fifth Circuit set

out what relationship must exist between the parties' contract and the claim for which indemnity is sought as follows: "[W]e have broadly construed language identical or similar to the 'arising in connection herewith' language in the . . . indemnity agreement to unambiguously encompass all activities reasonably incident [to] or anticipated by the principal activity of the contract." *Id.* at 1214. The implication of this construction for claims of employees was that

> where the presence of the injured person at the scene of the injury is attributable to or might reasonably be anticipated by his employment responsibilities, then his injuries occur "in connection with" those responsibilities. It is irrelevant that the person is not at that moment performing services or that the injury results from an activity not encompassed by the employer's contractual undertakings.

*Id.* at 1215. Applying this test to the claims of the injured worker, the Fifth Circuit concluded that the necessary relationship existed to bring the claim within the ambit of the indemnity agreement because the parties' contract contemplated that the rig where the employee was injured would be used as a heliport. *Id.* at 1216.

Though not using the term "knock-for-knock indemnity," the court went on to describe the purpose of knock-for-knock indemnity as dividing

> the responsibility for personal injury/death among the many employers and contractors according to the identity of the injured employee rather than according to which party's fault or negligence caused the injury. In effect, each party assumes the risk of the other's negligence and agrees to be responsible for injuries to its own employees no matter how, or by whom, caused.

34

*Id.* Because the worker's presence on the refueling rig was attributed to a relationship created by the oil company, it bore the responsibility for the claim under the indemnity provision. *Id.*

The same year that it decided *Fontenot*, the Fifth Circuit examined the scope of an indemnity provision with broad language providing for indemnity "*occurring in connection with, arising out of, or in any wise incident or related to Contractor's performing services and operations under this contract.*" *Marathon Pipe Line Co. v. M/V Sea Level II*, 806 F.2d 585, 590–91 (5th Cir. 1986). *Marathon Pipe Line* examined a claim from a different perspective than *Fontenot*; *Marathon Pipe Line* involved the question of whether a party's acts were so divorced from its contractual performance that it did not owe indemnity. *Id.* at 591. In *Marathon Pipe Line*, the owner of an undersea pipeline contracted with a company to do work on the pipeline. *Id.* at 587–88. That company in turn subcontracted with other companies to provide a vessel to transport materials to the site of the work and function as a work platform. *Id.* at 587. The pipeline owner also contracted with a different company to locate other pipelines in the area where work was being done. *Id.* at 588–89.

During a discussion with the captain of the platform vessel about where to drop its anchors, an employee of the company that was contracted to locate the pipelines advised against placing an anchor in the location that the captain wanted to place it. *Id.* at 587. Ignoring the concern raised, the captain placed the anchor in the location that he had selected, and a pipeline owned by another entity was damaged.

*Id.* at 587–88. When the entity owning the other pipeline sued to recover for damage to its pipeline, the companies owning the platform vessel claimed indemnity from the company locating the pipeline, relying on an indemnity provision in the contract between the pipeline owner and the locating company. *Id.* at 588.

In discussing the indemnity issue, the Fifth Circuit discussed the parties' various roles as defined by their contracts:

> [The owners of the platform vessel] cite language in the contract obligating [the locating company] to "perform all work requested by" [the owner of the pipeline being worked on]. To define requested work, they refer to a provision of the contract obligating [the locating company] to furnish labor and supplies among other items "for offshore pipeline location survey services, as required for" the overall construction project on the pipeline. These services further include "the correct placement of the marker buoys and maintenance of such buoys." The contract, however, makes no mention of a duty to assist the primary contractor or subcontractors in positioning the anchors of vessels. In the absence of any express or implied undertaking, we refuse to read [the locating company's] obligations as including a duty to assist in placing the [platform vessel's] anchors. The court did not err in characterizing [the locating company's employee's] advice as gratuitous.

*Id.* at 590.

No matter that the acts of the locating company's employees fell outside its contractual obligations, the platform vessel's owners argued that the locating company owed them indemnity as subcontractors of the owner of the pipeline being repaired. *Id.* They based this argument on the fact that the contract between the locating company and the pipeline owner had a provision obliging the locating company to indemnify the pipeline company and its subcontractors for claims "*occurring in connection*

36

*with, arising out of, or in any wise incident or related to Contractor's performing services and operations under this Contract.*" *Id.* at 590–91. The platform vessel owners argued that "the damage to [the] pipeline [damaged by the misplaced anchor] occurred in connection with, arose out of, or was related or incident to services performed by [the locating company] under its contract with [the pipeline owner]." *Id.* at 591.

The Fifth Circuit held that the locating company did not owe indemnity. *Id.* When the platform vessel's owners tried to predicate an argument for indemnity on the holding of *Fontenot*, the Fifth Circuit found this effort to be a bridge too far:

> [The owners of the platform vessel] urge that precedents in this Circuit support a broad construction of "occurring in connection with" language in indemnity provisions. *See*[,] *e.g.*[,] *Fontenot*, 791 F.2d at 1214. They compare the facts of this case with facts of other cases [that] typically have obligated the indemnifying party to pay an indemnitee for its liability arising from an incident not caused by the indemnitor. This view of the contract, however, would have us read the "occurring in connection with" language to cover a limitless number of unforeseeable casualties that might have occurred during the pendency of the construction work on [the] pipeline [being repaired]. The contract language in question, while broad, cannot be read in a vacuum to apply to any situation for which a colorable argument could be made that loss of property was somehow related to [the locating company's] services under the contract.
>
> We decline to characterize the damage to [the pipeline] as "occurring in connection with, arising out of, or in anywise incident or related to [the locating company's] performing services under" the [pipeline owner/locating company] contract in the absence of any indication that [the pipeline owner] sought and [locating company] agreed to such an unusual undertaking. This court has refused to extend the reach of an indemnity provision beyond the intent of the parties to the agreement where the undertaking urged would create "an unusual and su[r]prising obligation." *Corbitt* . . . , 654 F.2d [at] 333 . . . .

The language used makes it plain that [the pipeline owner] intended to draft the indemnity provision to cover all conceivable situations in which it might incur liability. The limit of that potential liability, however, was accidents that might occur during [the locating company's] performance of contract services. [The pipeline owner] could have no interest in requiring [the locating company] to protect other subcontractors from their own negligence when that negligence was independent of the performance of [the locating company's] contract.

*Id.* (footnote omitted).

A district court case seeking a common rationale for the holdings of *Fontenot* and *Marathon Pipe Line* found it in whether the performance of the contract containing the indemnity provision creates foreseeability of the type of claim for which indemnity is sought. *See Gisclair v. Galliano Marine Serv.*, 484 F. Supp. 2d 518, 523 (E.D. La. 2007). Specifically,

[i]n both *Fontenot* and *Marathon Pipe Line*, the Fifth Circuit was concerned with the foreseeability of the incident giving rise to the claim for indemnity. *See Fontenot*, 791 F.2d at 1214 ("all activities reasonably incident or anticipated by the principal activity of the contract"); *Marathon Pipe Line*, 806 F.2d at 591 (expressing concern that giving full effect to catch-all provisions "would have us read the 'occurring in connection with' language to cover a limitless number of unforeseeable casualties that might have occurred during the pendency of the construction work on [the pipeline being repaired]").

*Id.*

The Fifth Circuit's latest pronouncement on its view on the scope of broad indemnity agreements for acts falling outside the performance called for by a contract is *International Marine, L.L.C. v. Integrity Fisheries, Inc.*, 860 F.3d 754, 759 (5th Cir. 2017). The facts in *International Marine* involved a company hired to do an underwater survey.

38

*Id.* at 757. That company hired two other companies to provide vessels to perform the survey: one provided a vessel that towed the sonar device gathering the survey data, and the other provided a chase vessel that picked up the signals emitted by the sonar device. *Id.*

An employee of the company performing the survey was on the chase vessel and operated the equipment receiving the sonar signal; the only responsibilities of the company operating the chase vessel were to drive the vessel and to stay within a certain radius of the towed sonar device. *Id.* During the operation, the captain of the chase vessel informed the employee of the survey company on his vessel that the tow vessel was coming close to an underwater structure. *Id.* The employee passed the information to the captain of the tow vessel, who ignored the information and towed the underwater equipment into the structure, damaging it. *Id.* The company using the damaged structure sued the company conducting the survey and the owner of the tow vessel. *Id.* They, in turn, filed an indemnity claim against the owner of the chase vessel, relying on the indemnity provisions of an MSA that provided indemnity for claims "arising out of or related in any way to the operation of any vessel owned . . . by [the chase vessel's owner] . . . to perform work under this agreement except to the extent such loss, harm, infringement, destruction, or damages is caused by [the survey company or its contractor's] gross negligence or willful misconduct." *Id.* at 758.

*International Marine* examined the holdings of *Fontenot* and *Marathon Pipe Line* and set the interpretive boundary for contracts calling for indemnity arising out of a

contract's performance as being "[w]hen one party's negligent contractual performance causes third[-]party property damage *independent* of the alleged indemnitor's contractual performance, indemnity is usually not required absent a clear indication that the parties agreed to such an unusual undertaking." *Id.* at 759 (emphasis added). Applying this principle, the Fifth Circuit concluded that no indemnity claim lay against the chase vessel's owner "[b]ecause the summary[-]judgment evidence supports only the conclusion that the [chase vessel's] operation made no contribution to the negligent act causing the [damage to the underwater structure], indemnity is not owed under the MSAs." *Id.* at 760–61. *International Marine* concluded that *Fontenot*'s principle remained the law but noted that its rule went only so far:

> To be clear, we continue to subscribe to the general rule articulated in *Fontenot* that indemnity agreements containing language such as "arising out of" should be read broadly. *See . . .* 791 F.2d at 1214. It is only when the alleged indemnitor's contractual performance is *completely independent* of another party's negligent act that caused damage that we apply a limitation to this general rule. *See Marathon* [*Pipe Line*], 806 F.2d at 591.

*Id.* at 761.

### 6. Looking to the plain language of the provision and the holdings of the federal courts, we conclude that the trial court's interpretation of Section 8.3 is too broad.

As we have noted, the trial court signed a summary-judgment order that concluded, "The phrase 'arising in connection herewith' found in Section 8.3 of the MSA encompasses all activities reasonably incident [to] or anticipated by the principal

40

activity of the MSA, which is oil well operation." Obviously, this phraseology is lifted from *Fontenot*. *See* 791 F.2d at 1214. We conclude that the interpretation is too broad because it untethers the indemnity obligation from the contract containing the provision and brings activities independent of the contract within the scope of the indemnity provision simply because they relate to the general subject of the contract. Basically, the interpretation places RKI on the line to indemnify a party with whom it has an MSA for that party's activities no matter whether RKI sought those services or not. This construction requires RKI to indemnify a contractor for services that the contractor performs for anyone it chooses and deprives RKI of the autonomy to decide if the contactor was suited to perform the services and of the ability to monitor and control the delivery of those services.

As noted, in essence, we interpret the plain meaning of the words in the phrase "arising in connection herewith" to mean originating from the document or writing in which the phrase is contained. The obvious subject of the writing is the contractual performance called for by it. Instead of looking to that scope, the trial court's interpretation looks to what the contract involved in the most general sense. In our view, that does violence to the very purpose of the limiting language and practically makes the indemnitor the insurer of anything that one of its contractors does while on the wellsite. That is not a reasonable interpretation because it imposes "liability for those losses or liabilities [that] are neither expressly within its terms nor of such a

41

character that it can be reasonably inferred that the parties intended to include them within the indemnity coverage." *See Corbitt*, 654 F.2d at 333.

The trial court's construction thus imposes an obligation to indemnify for activities that are independent of the parties' contractual obligations, which appear to be the hinge pin of the federal courts' decisions as to the elasticity of phrases similar to those used in Section 8.3. We adopt a rationale limiting the scope of the language that is akin to that stated in *Marathon Pipe Line*:

> The limit of that potential liability, however, was accidents that might occur during [the locating company's] performance of contract services. [The pipeline owner] could have no interest in requiring [the locating company] to protect other subcontractors from their own negligence when that negligence was independent of the performance of [the locating company's] contract.

806 F.2d at 591. The language used in Section 8.3 does not have the clear indication that the parties agreed to such an unusual undertaking as RKI's agreeing to indemnify Crescent for work it undertakes for another party when that work is not performed under the RKI/Crescent MSA.

At bottom, the trial court's construction would give Crescent the keys to the indemnity kingdom. It could do work for anyone at the wellsite, in as slipshod a manner as it wished, and still claim that RKI owed it indemnity. And RKI would have none of the protections that the RKI/Crescent MSA affords it by being able to request work from Crescent that it considered Crescent competent to do and then

42

have the protections of the other provisions of the MSA to ensure that the work RKI

retained Crescent to do was performed safely and properly.[6]

### 7. The scope of the MSA

But interpreting the limiting language of Section 8.3 to performance under the

RKI/Crescent MSA does not end the task of determining the scope of the indemnity

that RKI owed Crescent. We must also answer the question of what the scope of

---

[6]For example, the RKI/Crescent MSA provides the following:

2.2 [Crescent] warrants its services, workmanship, materials[,] and equipment provided to [RKI] . . . .

2.3 All work or services rendered or performed by [Crescent] shall be done with due diligence, in a good and workmanlike manner, using skilled, competent[,] and experienced workmen and supervisors. . . .

. . . .

5.1 When requested by [RKI], or if otherwise applicable, [Crescent] will furnish regular reports (either daily, weekly, bi-weekly[,] or monthly as requested by [RKI]) covering work, services, and/or materials furnished by [Crescent] for which [RKI] is obligated to pay. . . .

. . . .

5.3 [Crescent] agrees to and shall be solely responsible for the safety of its employees, subcontractors, consultants[,] and agents, as well as its subcontractors' employees and agents and their respective invitees and guests. . . .

. . . .

7.1 At any and all times during the term of this Agreement, [Crescent] shall, at [Crescent]'s sole expense, carry insurance . . . .

performance was under the RKI/Crescent MSA.  Again, the parties offer clashing interpretations.

RKI argues that the RKI/Crescent MSA created a scope delimited by the provisions of the specific scope provision of the MSA, which provides,

1.0  SCOPE AND TERM OF AGREEMENT

1.1  This Agreement shall control and govern all activities of [Crescent] in connection with the performance of services and/or supply of materials and equipment by [Crescent] for [RKI] under subsequent verbal or written purchase orders, work orders, supplemental agreements, delivery tickets[,] or other similar agreements, hereinafter each called a "Work Order[."]

RKI then highlights the fact that it is undisputed that the only equipment provided by Crescent pursuant to the terms of the MSA was a boom lift and a light tower and that such equipment was not involved in the sand-separator explosion.

Crescent does not claim that the boom lift and light tower were involved in the accident but argues for an interpretation of the MSA that does not limit its scope to that defined by work orders and instead argues that RKI "created comprehensive indemnity provisions in its MSA to allocate risks at its work site."  In its post-submission letter brief, Crescent touches on this rationale as follows:

The other issue raised by the panel in connection with the interpretation of "party" was a concern about "circular indemnities."  There should be no such concern.  The "MSA program" was drafted by RKI and imposed on all its contractors at the urging of RKI's insurer.  Under that program, a contractor that employs a worker who brings a claim indemnifies RKI and all of its other contractors and their subcontractors.  That is proper because the indemnifying employer is best able to protect its own worker.  If that contractor fails to indemnify

44

everyone else—because RKI chose to contract with an under-funded or under-insured contractor—then RKI indemnifies all the other contractors and their subcontractors. That too is proper because RKI maintained ultimate control over the entire well[]site. [Record reference omitted.]

Crescent's interpretation is unpersuasive. The argument tries to expand the evidence that we should consider in making our determination of what the MSA means beyond the language that the MSA uses. Perhaps, the arrangement that Crescent advocates for is a reasonable one. The plain language of the MSA, however, does not implement it.

Also to support its broad interpretation of RKI's indemnity obligations, Crescent weaves together a number of the MSA's provisions, which include the following:

- Section 8.1 of the MSA states that the indemnity provided is "to the maximum extent permitted by law" and without consideration of the indemnified parties' negligence;

- The provision placed in the MSA to "COMPL[Y] WITH THE REQUIREMENT" of the express negligence rule by conspicuously stating that the indemnitor is responsible for the negligence of the indemnitee;

- Section 8.3 of the MSA that Crescent broadly interprets to mean that "under the broad indemnity provision in the RKI/Crescent MSA, *any connection* to the oil well[]site operations qualified Crescent for indemnity as to claims from

45

RKI's other contractors (including Ameriflow) and their employees. Crescent had such a connection"; and

- The fact that, in Crescent's view, the MSA allowed RKI to call on an unlimited scope of work from Crescent at the wellsite because the MSA stated, "WHEREAS, [RKI] in the normal course of business regularly and customarily enters into contracts with independent contractors for providing work, services and/or equipment related to [RKI's] operations."

Our reasons for rejecting Crescent's interpretation are multi-fold. First, simply because the MSA states that indemnity is to the maximum extent as provided by law cannot be read to equate to a meaning that the indemnity is unlimited or at least not controlled by the specific provisions of the MSA governing that indemnity. Second, the same is true of Crescent's attempt to argue that the express negligence provision should trump the provisions controlling the scope of the negligence. Third, we have already rejected the argument that Section 8.3 has the breadth advocated for by Crescent. Fourth, to argue that RKI must indemnify Crescent for work done outside the scope of the RKI/Crescent MSA because RKI could call on Crescent to do work, even though RKI did not do so, would impose an indemnity obligation on RKI for any work that Crescent decided to do for anyone on the wellsite.[7] Again, Crescent

---

[7]As a final matter, Crescent lambasts RKI's argument that the RKI/Crescent MSA does not create a right to indemnity as follows:

46

never explains why RKI should have an indemnity obligation but forfeit its right to control what work will fall within that obligation.

Accordingly, we sustain RKI's first issue.

**D.  Even though we reject the trial court's interpretation of the RKI/Crescent MSA, we reject RKI's argument that the pleadings in the New Mexico suits establish that Crescent cannot recover indemnity as a matter of law.**

RKI argues that if we adopt its narrower interpretation of the RKI/Crescent MSA, we should either remand this matter to the trial court or render judgment that

---

Finally, RKI's argument is actually self-defeating. If Crescent had absolutely nothing to do with this accident, then obviously the settlement had nothing to do with Crescent's conduct. Crescent was included to close out the lawsuit and end defense costs that RKI had the obligation to pay based on allegations in the lawsuit. As will be discussed later in this brief, the settlement amount was reasonable for the injuries and death, period. That is true even if Ameriflow had been the only party to the settlement. RKI's misguided requirement for segregation—aside from having no contractual support—is meaningless given its own argument that Crescent had nothing to do with the accident.

RKI's nonsensical argument appears to be that Crescent should have never been sued, so no indemnity is owed. Apparently, then, RKI is recanting its own cross-claim against Crescent for contributing to the accident. In any event, RKI is essentially arguing that Crescent should have refused to [have been] included in the settlement[;] should have insisted on a trial[;] and then after winning the trial[,] should have stuck RKI with the entire cost of defense given RKI's obligation to defend based on allegations by the plaintiffs. That is an absurd position. [Record reference omitted.]

We do not read RKI's argument as being that Crescent should never have been sued but that it did not owe indemnity to Crescent. Based on the language of the RKI/Crescent MSA, we have concluded that the construction placed on the indemnity provision by Crescent is too broad.

Crescent take nothing. This argument flows from the contention that Crescent admitted that the boom lift and the light tower that it provided pursuant to the terms of the RKI/Crescent MSA were not involved in the explosion that produced the New Mexico lawsuits and that the pleadings in those suits did not bring Crescent within the terms of the indemnity provision of the RKI/Crescent MSA.

We agree that this matter should be remanded but for reasons different than those raised by RKI. First, the trial court's later summary judgments establishing RKI's liability on the indemnity claims were based on a flawed interpretation of the RKI/Crescent MSA, and the parties should have the opportunity to develop their arguments based on the interpretation that we have adopted. Second, the RKI/Crescent MSA covers not only Crescent but also "its affiliates and subsidiaries." The state of the record is such that it is impossible to resolve Crescent's indemnity claim as a matter of law because there is testimony in the record that suggests that Ameriflow may be a Crescent affiliate or subsidiary because Crescent owns Ameriflow.

To resolve this issue, we must first resolve what source of information we should examine to determine whether indemnity is owed. Though it may now lead to a resolution that RKI did not intend, we agree with RKI that the general rule is that the indemnity determination should be made based on the facts proven about the underlying claim rather than the pleadings alone. *See DBHL, Inc. v. Moen Inc.*, 312 S.W.3d 631, 637 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) ("[A] duty to

indemnify is triggered by the facts, not merely any underlying pleadings."); *Tesoro Petroleum Corp.*, 106 S.W.3d at 125 ("Facts, . . . not allegations, determine an indemnitor's duty to indemnify.").

When dealing with indemnity under an insurance policy, a recent federal case explained how indemnity is usually predicated on the facts unless the pleadings negate the possibility of indemnity:

> "Facts, however, not allegations, determine an indemnitor's duty to indemnify." *Westport Ins. Corp. v. Atchley, Russell, Waldrop & Hlavinka, L.L.P.*, 267 F. Supp. 2d 601, 625 (E.D. Tex. 2003) (citing *Tesoro Petroleum Corp. . . . , 106 S.W.3d [at] 125 . . . ).* The duty to defend may be triggered by the pleadings, but the duty to indemnify is based on the jury's findings. [*Farmers Tex. Cnty. Mut. Ins. Co. v.*] *Griffin*, 955 S.W.2d [81,] 82[ (Tex. 1997)]. Thus, the actual facts determined in the underlying litigation, or as otherwise made available, determine whether the insurer has the duty to indemnify. *See Chiriboga v. State Farm Mut. Auto. Ins. Co.*, 96 S.W.3d 673, 680 (Tex. App.—Austin[ 2003, no] pet.) (citing *Trinity Univ[ersal] Ins. Co. v. Cowan*, 945 S.W.2d 819, 821 (Tex. 1997)). "Generally, Texas law only considers the duty-to-indemnify question justiciable after the underlying suit is concluded, unless 'the same reasons that negate the duty to defend likewise negate any possibility the insurer will ever have a duty to indemnify.'" *Northfield Ins. Co. v. Loving Home Care, Inc.*, 363 F.3d 523, 529 (5th Cir. 2004) (quoting *Griffin*, 955 S.W.2d at 84).

*Amerisure Ins. Co. v. Thermacor Process, Inc.*, No. 4:20-cv-01089-P, 2021 WL 1056435, at *6 (N.D. Tex. Mar. 19, 2021) (mem. op. & order).

Crescent seems to challenge the general proposition—indemnity claims should be determined on the facts—by arguing that the contractual right to indemnity should be determined as a matter of law. The cases that Crescent cites for this proposition are inapposite as they deal with the construction of the indemnity provision itself

49

rather than whether the facts create a right to indemnity after the provision has been construed. *See Fisk Elec. Co. v. Constructors & Assocs., Inc.*, 888 S.W.2d 813, 815–16 (Tex. 1994) (determining as a matter of law that indemnity was not owed because indemnity provision failed to meet requirements of express-negligence doctrine); *Tesoro Petroleum Corp.*, 106 S.W.3d at 125 (construing indemnity provision as a matter of law to exclude claims for gross negligence and willful misconduct).

Even if we were to accept Crescent's argument that the pleadings were the source of proof that we should rely on to resolve whether it has a right to indemnity, it would not establish that claim as a matter of law in view of our holding addressing the scope of the RKI/Crescent MSA's indemnity provision. Crescent spends six pages of its brief outlining the allegations in the Magdaleno and De La Hoya suits. It notes that the Magdaleno and De La Hoya pleadings allege that RKI controlled the wellsite where they were injured and that RKI was negligent in how it exercised that control. Crescent highlights that the pleadings allege that RKI hired various contractors to work on the wellsite and that RKI breached various duties to supervise, monitor, and control the contractors or was vicariously liable for the contractors' activities. Crescent then notes that the pleadings allege various acts of negligence against it for its wellsite activities, which included training of individuals on the wellsite. But the allegations that Crescent highlights are geared toward the broad construction of the indemnity provision in the RKI/Crescent MSA adopted by the trial court, i.e., that the phrase "arising in connection herewith" "encompasse[d] all

activities reasonably incident [to] or anticipated by the principal activity of the MSA, which is oil well operation." We have rejected that broad construction.

Crescent also argues that it should receive indemnity as a subcontractor of Ameriflow. As we discuss below, we do not reach this argument because it was not raised as a summary-judgment ground.

This all said, on the record before us, there are open questions that impact Crescent's indemnity rights. "Contractor" is defined in the RKI/Crescent MSA as "Crescent Services and *its Affiliates and Subsidiaries.*" [Emphasis added.] And, as noted, the pleadings in the New Mexico suits allege that Crescent provided safety training and management services to Ameriflow. At this point, we have no idea what the relationship is between the two nor how the services were provided (if they were provided). Thus, the hints contained in the record as to the relationships do not provide us with the information to resolve the indemnity question as a matter of law.

Specifically, the record is vague regarding what the relationship between the two was. And what the record does contain about the relationship between Ameriflow and Crescent impacts whether Crescent may fall within the indemnity provisions of the RKI/Crescent MSA, with the MSA defining the "Contractor" as "Crescent Services and its Affiliates and Subsidiaries" and the indemnity obligation flowing to the Contractor. Both parties note the testimony of an expert hired by the plaintiffs in the Magdaleno suit that discussed safety audit services that Crescent provided; the expert contended that such services contributed to the explosion of the

51

sand separator. The expert testified that the audit was performed but that Ameriflow

was a subsidiary of Crescent.[8] Further, both the RKI/Crescent MSA and the

---

[8]Specifically, the record contains the following exchange:

Q. Okay. I'll represent to you that the law that's going to be applicable here is that you can't reach a parent through its subsidiary, okay? So, if you agree with -- do you agree with me on that general principle?

[Counsel for the plaintiffs in the Ortega suit]: Object to form. That's pretty legal.

A. Well, yeah, I -- I would say it trickles down the other way. So, Crescent Services -- if the audit had been done before the incident, Mr. Whitmire [an employee of Ameriflow] says the result would have been the same.

Q. (BY [Crescent's attorney]) Now --

A. So, if -- Crescent Services, had they done the audit before the incident, would have known that their subsidiary did not have a good safety program. So, that's what I'm looking at is Crescent Services knew and could have known before the incident, Mr. Whitmire says, that Crescent Services' subsidiary -- not going up, going down -- did not have a proper safety program.

Q. And that is based on what?

A. Based on the audit.

Q. Again, the audit of Rock Deschaine, an independent representative from TCR Management in San Marcos.

A. Well, he's a consultant who's working for Crescent companies.

Q. He was not working for Crescent companies.

A. He's a consultant.

RKI/Ameriflow MSA show the same addresses for both companies and are signed by the same person on behalf of both entities.

Thus, we are faced with a record in which RKI does not contest that it owes Ameriflow indemnity under the RKI/Ameriflow MSA, the RKI/Crescent MSA that potentially embraces both Ameriflow and Crescent (should Ameriflow be a Crescent subsidiary), and an undeveloped record of facts about the relationships and activities of those parties. In view of this record, we cannot say that even with our narrower interpretation of the indemnity provision in the RKI/Crescent MSA that we can resolve the question of the indemnity owed to Crescent as a matter of law.

---

Q. What evidence do you have that Mr. Deschaine was working for Crescent?

A. Well, he did the audit for Crescent. He didn't just one day get up and say, "I'm going to leave San Marcos and go out in West Texas and do an audit." He was hired by the Crescent entities to do the audit.

Q. An audit of Crescent or audit of Ameriflow?

A. Of Ameriflow.

Q. Okay. So, again, we're going to go back --

A. The audit was of Ameriflow.

Q. The audit was of Ameriflow. You agree with me on that.

A. Yeah, absolutely.

Q. Okay. So --

A. But Crescent's the parent company. He did the audit as a consultant for Crescent of Ameriflow, their subsidiary, and he said the subsidiary has a bad safety program.

53

**E.** **We analyze RKI's challenge that damages were not proven as a matter of law because the damages were not segregated between a party that could recover damages—Ameriflow—and a party that could not—Crescent.**

As noted, Ameriflow and Crescent presented this case on summary judgment by each attempting to prove that they have a free-standing right to indemnity through their respective MSAs. Thus far, we have held that the construction placed on the RKI/Crescent MSA by the trial court is overly broad. However, on the basis of the terms of the RKI/Crescent MSA and the record below, we have also held that the record does not forestall as a matter of law the possibility that Crescent is entitled to indemnity under the terms of its MSA. Without the determination of whether Crescent has a right to indemnity, it is premature to address the questions of whether the proof before the trial court was sufficient to prove as a matter of law that the settlement of the Magdaleno suit was reasonable and prudent or how attorneys' fees were proven. However, to the extent that Ameriflow and Crescent argue that they have a means of establishing a right to indemnity that is not dependent on the terms of the RKI/Crescent MSA—and which makes that argument raised by RKI that they had to segregate their proof of damages unreasonable—we address those arguments because they have the potential to obviate the need to answer the question regarding whether Crescent has a right to indemnity under the terms of the RKI/Crescent MSA. We conclude that the arguments raised to avoid RKI's segregation argument are not persuasive.

To begin, RKI premises its second issue—its segregation argument—on the principle that the proof of damages offered by Ameriflow failed to segregate between it as a party entitled to indemnity and Crescent, which is a party not entitled to indemnity. RKI relies on the principle from cases that require an allocation of damages between perils that are covered and those that are not. The Fifth Circuit recently discussed this principle and what proof satisfies the allocation requirement as follows:

> In Texas, a party seeking coverage under an insurance policy must prove that its damages are covered by the relevant policy before it can recover. *Seger v. Yorkshire Ins. Co.*, 503 S.W.3d 388, 400–01 (Tex. 2016). This process of segregating out covered and non-covered damages is known as "allocation." *See Satterfield & Pontikes Constr., Inc. v. U.S. Fire Ins. Co.*, 898 F.3d 574, 581 (5th Cir. 2018). The coverage-seeking party carries the allocation burden, and a failure to allocate covered and non-covered damages is fatal to recovery. *See Travelers Indem. Co. v. McKillip*, 469 S.W.2d 160, 163 (Tex. 1971).

> Thus, to satisfy its allocation burden at summary judgment, [appellant] was required to present evidence upon which a fact[]finder could segregate covered damages. *See Satterfield*, 898 F.3d at 581. This evidence could consist of "any facts that could have been considered in the [underlying] lawsuit itself," including "internal memoranda, correspondence between the insurer and insured, communications with the injured party, [and] investigative reports." *Am. Int'l Specialty Lines Ins. Co. v. Res-Care Inc.*, 529 F.3d 649, 656–57 (5th Cir. 2008) (quotation omitted). Though [appellant] was not required to submit evidence establishing damages with "mathematical precision," it did need to provide evidence creating "some reasonable basis" for allocation. *Fiess v. State Farm Lloyds*, 392 F.3d 802, 808 n.24 (5th Cir. 2004). Additionally, it was not necessary to have the actual settlement agreement in the [u]nderlying [l]awsuit provide the allocation. *See, e.g., Cooper Indus. LLC v. Am. [Int'l] Specialty Lines Ins. Co.*, 350 F. App'x 876, 877–79 (5th Cir. 2009) (per curiam) (holding that the district court did not err in apportioning settlement even though "the settlement agreement did not

55

allocate responsibility between" insurer and insured); *LGS Techs., LP v. U.S. Fire Ins. Co.*, No. 2:07-CV-399, 2015 WL 5934689, at *6 (E.D. Tex. 2015) [(second report & recommendation of the court-appointed special master)] (allocating settlement proceedings post-settlement agreement); *RLI Ins. Co. v. Phila. Indem. Ins. Co.*, 421 F. Supp. 2d 956, 958 (N.D. Tex. 2006) (same).

*Great Am. Ins. Co. v. Emps. Mut. Cas. Co.*, 18 F.4th 486, 492 (5th Cir. 2021).

As RKI notes in its reply brief, Ameriflow and Crescent do not attack RKI's articulation of the segregation principle or its potential application to the situation of a joint settlement in which one party is entitled to indemnity and one is not. Instead, Ameriflow and Crescent make a host of arguments that seem to acknowledge the viability of the segregation principle but attempt to invalidate its application to their claims.

> **1.** **We reject the argument that Crescent may recover indemnity as a subcontractor of Ameriflow because that argument was not raised as a ground for summary judgment.**

First, Ameriflow and Crescent argue that Crescent has the right to recover indemnity under the terms of Ameriflow's MSA because it was a subcontractor of Ameriflow. This argument notes that RKI has now conceded that it owes Ameriflow indemnity for the Magdaleno suit and that

> RKI's liability to indemnify Ameriflow extended to Crescent. Crescent was entitled to indemnity through the express language of [S]ection 8.3 in which RKI agreed to protect, defend, indemnify, and hold harmless Ameriflow *and its subcontractors*. Thus, RKI had a contractual obligation to Ameriflow and its subcontractors, including Crescent, as well as an obligation to Crescent under the RKI/Crescent indemnity provisions. Segregation simply makes no sense when both Ameriflow and Crescent are protected. [Record reference omitted.]

Later Appellees' brief augments this argument by referencing the "arising in connection herewith" language of the RKI/Ameriflow MSA's indemnity provision, which is the same as the indemnity provision in the RKI/Crescent MSA that we have plumbed in detail, and by arguing that

> [t]he MSA with Ameriflow required Ameriflow to provide sufficient supervision and training for its employees, subcontractors, consultants, and agents. *To the extent Crescent failed to provide training and safety services to Ameriflow's employees, subcontractors, consultants, and agents, Crescent is entitled to indemnification as a subcontractor of Ameriflow.* This includes protection from Ameriflow's negligence and Crescent's own negligence, as stated in [S]ections 8.3 and 8.12 of [the] Crescent and Ameriflow MSAs. As the work being performed by Crescent was connected to the MSAs, and as the accident was connected to RKI's oil well operations, Crescent is entitled to indemnity under the MSAs. *See Nabors Drilling . . .* , 2013 WL 3488152, at *3. [Emphasis added and record references omitted.]

RKI responds to the subcontractor argument by highlighting that Crescent never sought indemnity based on its status as an Ameriflow subcontractor and did not rely on that status as a basis for its summary-judgment motions. Specifically, RKI highlights the following:

- Crescent's demands for indemnity from RKI were based on the RKI/Crescent MSA, not the RKI/Ameriflow MSA.[9]

- Crescent pleaded its indemnity claim against RKI based on the RKI/Crescent MSA, not the RKI/Ameriflow MSA.

---

[9]RKI also highlights that Crescent did not give the notice required by Section 8.7 to claim indemnity under the RKI/Ameriflow MSA.

- When asked in requests for admission about its contractual relationship with Ameriflow, Crescent objected that such an inquiry was irrelevant.

- Crescent did not predicate its summary-judgment motions on the RKI/Ameriflow MSA but instead on the RKI/Crescent MSA.

When given the opportunity to file a post-submission letter brief to rebut RKI's contention that Crescent did not raise the issue of a claim flowing through the RKI/Ameriflow MSA, Crescent filed a letter that appears to concede that it did not raise this ground below:

> *Appellees continue to assert that Crescent is also entitled to indemnity when acting as a subcontractor for Ameriflow. And while that precise issue was not expressly raised below*—although implicated by the overall presentation of the issues—it is improper for RKI to obtain on appeal the summary judgment [that] it was denied below on a ground that actually creates an indemnity obligation under the RKI/Ameriflow MSA, which was before Judge Burgess in all proceedings below. [Emphasis added.]

Thus, we agree with RKI that Crescent cannot rely on its claim that it falls within the ambit of the RKI/Ameriflow MSA indemnity provision as an Ameriflow subcontractor because it cannot raise a new ground for summary judgment on appeal. *See Peterson, Goldman & Villani v. Ancor Holdings, LP*, 584 S.W.3d 556, 570 (Tex. App.—Fort Worth 2019, pet. denied) ("It is settled that a court cannot grant summary judgment on grounds that were not presented.").

And even if Crescent's failure to raise its status under the RKI/Ameriflow MSA were not an obstacle to Crescent's contention, the record does not establish as a

matter of law that Crescent acted as a subcontractor of Ameriflow. As we have already noted, the relationship between Ameriflow and Crescent is unclear from the record; the two are apparently related, but the ownership structure is unexplained by the record, which contains only some suggestions that Crescent owns Ameriflow. How that relationship—whatever it may be—potentially impacts Crescent's argument that it is Ameriflow's subcontractor is, at this point, an unknown and is not one that can establish Crescent's entitlement to indemnity under the RKI/Ameriflow MSA as a matter of law.[10]

### 2. We reject the argument that RKI waived its right to contest the indemnity claims of Ameriflow and Crescent.

Ameriflow and Crescent make a number of arguments that appear to have the same pivot point: RKI waived its right to contest their indemnity claims. We disagree.

First, Ameriflow and Crescent argue that because RKI wrongfully denied defense and indemnity, RKI is bound by the settlement of the Magdaleno suit and cannot insist on an adjudication. Ameriflow and Crescent's argument proceeds,

---

[10]We raised a question during oral argument regarding whether the RKI/ Ameriflow MSA protected Crescent from its own negligence as a subcontractor of Ameriflow and thus whether the MSA met the requirements of the express-negligence doctrine for Crescent acting in a subcontractor role. As we have noted, the relationship of Ameriflow and Crescent is unclear. We do not have the information necessary to address the interrelationship between those parties and the implications that interrelationship (if any) poses with respect to the express-negligence doctrine. Further, the issue of the express-negligence doctrine has not been a point of dispute thus far in the litigation. In its brief, RKI stated that it was "not challenging that the MSA passes that [express-negligence] test."

Under these circumstances, there was no voluntary payment by Crescent that negates the indemnity. Crescent was sued for its connection to its MSAs with RKI and for its connection to RKI's MSA with Ameriflow. The settlement was made jointly with Ameriflow, and the amount was reasonable as to Ameriflow by itself.

The sparsity of the argument makes it difficult to unpack.

Ameriflow and Crescent make a similar argument later in their brief when they argue that RKI's acts caused their damages. Their argument notes that they had

incurred damages for defending the New Mexico lawsuits, paying a settlement amount, and incurring attorney[s'] fees, expenses, and costs— all of which were anticipated under the MSA, as natural, probable, and foreseeable consequence[s] of breaching indemnity obligations. Ameriflow and Crescent had to expend significant financial resources to defend and settle the Magdaleno lawsuit when RKI did not indemnify them.

Their argument concludes,

By refusing to defend and indemnify Ameriflow and Crescent, RKI became liable for the resulting damages awarded by the trial court— including the amounts paid in defense of the Magdaleno and [D]e [L]a Hoya lawsuits, the settlement of the Magdaleno lawsuit, and also the expenses in prosecuting this breach[-]of[-]contract action. Such damages all logically, naturally, and foreseeably extend from RKI's breach of the MSAs.[11]

Finally, Ameriflow and Crescent note the testimony they offered to support their contention that the settlement of the Magdaleno suit was reasonable, given the potential for an adverse verdict and that the potential verdict might be rendered in view of the history of verdicts in the county where it was filed. They note as well a

---

[11]If this argument is simply that RKI caused damages, then obviously that argument must be supported by a finding of liability.

later arbitration award against the counsel representing the Magdaleno family, which estimated a verdict of $10 million and attributed 50% of the fault to RKI. Further, Appellees' brief notes that

> in addition to jury award estimates in the relevant jurisdiction, the settlement was in good faith based on all the circumstances leading to the settlement based on RKI's conditional offer and refusal to negotiate, various evaluations by defense counsel, an assessment on the risks of not settling the cases, and RKI's refusal to provide unqualified indemnity.

Next, the brief outlines what Ameriflow and Crescent view as many failings on the part of RKI, such as not participating in settlement negotiations, ignoring Crescent's demand for indemnity, refusing to enter an appearance in the Magdaleno suit for Ameriflow, failing to file a declaratory-judgment action, and having a "conflict of interest" by claiming that RKI breached its MSA while disputing that it owed an indemnity obligation to Crescent. When this argument focuses, it is again based on the argument that "[w]hen an indemnitor denies any obligation under an indemnity agreement, the indemnitee has a right to make, in good faith, a reasonable settlement with the injured party without any judicial ascertainment of liability."

First, the premise of the argument as to Crescent is now faulty. Whether RKI wrongfully denied indemnity to Crescent remains unestablished.

Second, the very case that Ameriflow and Crescent rely on seems to actually undermine their contention that the denial of indemnity frees them from proof that the settlement was reasonable and prudent. Ameriflow and Crescent cite to *Sun Oil Co. (Del.) v. Renshaw Well Serv., Inc.* for the proposition that denial of indemnity binds

the indemnitor.  571 S.W.2d 64, 67 (Tex. App.—Tyler 1978, writ ref'd n.r.e.).

However, the entire paragraph from which the cited phrase is extracted states that

> [a]n indemnitor waives the right to insist upon a judicial determination of the indemnitee's liability by denying any obligation under the indemnity agreement.  The indemnitor may not, however, be held liable for a purely voluntary payment by the indemnitee.  *Mitchell's, Inc. v. Friedman*, . . . 303 S.W.2d 775, 779 (Tex. . . . 1957).  The Supreme Court of Texas, in addressing the point raised here by appellee, has said[,]

> > "As to the status of the indemnitee in a case wherein a settlement was made with the injured party, [a]fter denial of liability on the part of the indemnitor, we said: (quoting *Mitchell's, Inc. v. Friedman*, supra.)

> > ' . . . Having settled the claim without obtaining a judicial determination of its liability, petitioner (indemnitee) assumed the risk of being able to prove the facts which [m]ight have rendered it liable to the plaintiff as well as the reasonableness of the amount which it paid.  It will be necessary, therefore, for petitioner to establish that from its standpoint the settlement was made in good faith and was reasonable and prudent under the circumstances.'

> *Gulf, Colo*[.] *& Santa Fe* [*Ry. Co.*] *v. McBride*, . . . 322 S.W.2d 492, 495 (Tex. . . . 1958).

*Id.* at 67–68.  Thus, the suggestion that an indemnitee is freed from having to prove a settlement is reasonable and prudent by the denial of an obligation to indemnify is not borne out by the quote.  Ameriflow and Crescent's argument also presumes that the settlement was involuntary but makes a fact-laden argument that we should accept that conclusion and cites us to no case to support the conclusion that the settlement was involuntary as a matter of law.

And RKI cites us to another case for its contention that Ameriflow and Crescent bear the burden to prove that the settlement was reasonable and prudent. *See Colonial Title Co. v. Commonwealth Land Title Ins. Co.*, No. 12-16-00328-CV, 2017 WL 4675535, at *2 (Tex. App.—Tyler Oct. 18. 2017, no pet.) (mem. op.) (stating that when an indemnitee voluntarily settles a claim of its indemnitor, "absent an unconditional contractual right to settle, without obtaining a judicial determination of its liability, it assumes the burden in its action for reimbursement of proving that it was potentially liable to the claimant, the settlement was prudent and made in good faith, and the amount was reasonable").[12]

Thus, on the face of the record in this matter and the other issues at play in it and on the question of whether the authority cited by Ameriflow and Crescent actually supports their argument, we hold that RKI's denial of the obligation to indemnity did not free Ameriflow and Crescent of the burden to establish that indemnity was owed and that the Magdaleno settlement as a matter of law was reasonable and prudent.[13]

---

[12]If Ameriflow and Crescent are attempting to invoke the rule dealing with whether an insurer is bound by its insured's settlement found in *Evanston Ins. Co. v. ATOFINA Petrochems., Inc.*, 256 S.W.3d 660, 671 (Tex. 2008) (op. on reh'g), they offer no guidance on how that rule should apply to the instant case.

[13]In a footnote, Ameriflow and Crescent argue that the MSAs do not contain a provision that requires the settlement amount, litigation expenses, and court costs to be subjected to a reasonableness scrutiny. It is true that the MSAs do not contain such a provision. But as RKI notes, the settlement amount is subject to a reasonableness scrutiny absent a contractual provision granting an unconditional right

**3. We reject Ameriflow's argument that the damage award for the Magdaleno settlement is reasonable as to Ameriflow alone because it did not move for summary judgment on that ground.**

Ameriflow next highlights the evidence that it offered to show that the settlement amount of the Magdaleno matter was standard in New Mexico death cases. It then argues that several conclusions should be drawn from the evidence that it recites:

> The $9.1 million . . . settlement is a reasonable settlement for Ameriflow only, as shown by the unrebutted damages testimony provided by Appellees' expert witnesses. As discussed above, Crescent would be entitled to indemnification as a subcontractor of Ameriflow in any event. Additionally, Crescent was properly included in the settlement as it resolved the claims against Crescent covered by the RKI/Crescent MSA and ended RKI's duty to defend Crescent under that MSA. [Record references omitted.]

To the extent that Ameriflow argues that the settlement was reasonable as to it alone, Ameriflow and Crescent's third amended motion for summary judgment on damages—the operative summary-judgment motion on the question of damages—appears to posture the damage claim for the Magdaleno settlement as a joint claim of both Ameriflow and Crescent.[14] Thus, Ameriflow appears to be again raising an issue to support the trial court's judgment that was not raised below.

---

to settle before liability has been judicially determined. *See Colonial Title Co.*, 2017 WL 4675535, at * 2.

[14]We set out the operative portion of the amended summary-judgment motion dealing with the Magdaleno settlement:

The *Magdaleno* lawsuit settlement meets this standard. The lawsuit was settled because RKI breached the MSAs as a matter of law which breach caused AMERIFLOW/CRESCENT to settle the New Mexico lawsuits. Although not necessary, AMERIFLOW/CRESCENT faced potential liability as the Magdaleno Plaintiffs alleged that AMERIFLOW and CRESCENT were solely liable [for] Roberto Magdaleno's death because AMERIFLOW owned and used the sand separator [that] exploded on RKI's well[]site, and CRESCENT, along with AMERIFLOW, in part, [was] responsible for the personnel on the site, their training, equipment, processes[,] and well[]site safety. Similar cases involving work[-]site deaths and personal[-]injury claims in . . . San Miguel County, New Mexico[,] and surrounding areas have resulted in jury verdicts in excess of six to seven digits with a demonstrated range between $50,000,000 to $160,000,000, well in excess of the *Magdaleno* settlement amount. Indeed, the Magdaleno[ Plaintiffs'] initial demand of $60,000,000 is reflective of this range. *Magdaleno's* penultimate demand was $15,000,000.00[,] which was rejected. The potential damages recoverable in New Mexico include personal injury, medical expenses, lost wages, loss of future earnings, and loss of consortium [that] can be valued by an economist. New Mexico allows the recovery of hedonic damages. *Magdaleno's* economist estimated economic damages alone in a range of $1.3–3.0 million . . . . The parties conducted two failed settlement negotiations . . . in December 2015 and April 2016, [and] the [parties] reached a settlement agreement on September 26, 2016[,] with . . . AMERIFLOW and CRESCENT [agreeing to pay the *Magdaleno* Plaintiffs] $9,100,000 for which [Ameriflow] seeks recovery.

The settlement was prudent given the potential exposure to an adverse verdict[] and [was] reasonable given the potential jury[-]verdict history in the jurisdiction. Indeed, a subsequent malpractice lawsuit by the Magdaleno family against their personal[-]injury attorney for mishandling the underlying New Mexico lawsuit resulted in an arbitration award in favor of Magdaleno [that] estimated a potential jury verdict of $10,000,000.00[,] which corroborates the reasonable settlement amount reached by Ameriflow and Crescent with Magdaleno[.] Further, in addition to area jury[-]award estimates, the settlement was in good faith based on all the circumstances leading to the settlement based on RKI's conditional offer and refusal to negotiate, various evaluations by defense counsel, an assessment on the risks of not settling the cases, and RKI's refusal to provide unqualified indemnity.

With respect to the arguments that Crescent is entitled to indemnity as an Ameriflow subcontractor, we have already discussed that this is another of the arguments that is now being made but that was not raised as a ground for summary judgment. Finally, whether the settlement "resolved the claims against Crescent covered by the RKI/Crescent MSA" remains an open question in view of our holdings about the breadth of indemnity provided by the RKI/Crescent MSA.

### 4. We reject Ameriflow and Crescent's claims that they may recover under the equitable doctrines of equitable subrogation and quantum meruit.

After RKI's opening brief challenged Ameriflow and Crescent's ability to support the trial court's judgment with the alternative equitable theories raised in their third amended motion for summary judgment on damages, Appellees argue on appeal that two equitable doctrines support the trial court's judgment—equitable subrogation and quantum meruit.[15] In the arguments about these doctrines, Appellees' brief is not persuasive regarding why the doctrines can be used to circumvent the issues of

---

Therefore, the Magdaleno settlement and amount was reasonable, prudent[,] and made in good faith as a matter of law. *Gulf, Colo*[.] *& Santa Fe* [*Ry. Co.*] *v. McBride*, 322 S.W.2d 942 (Tex. 1958); *In re Exxon Mobile Corp.*, 389 S.W.3d 577, 580 (Tex.[ App.—]Houston [14th Dist.] 2012[, orig. proceeding]). [Footnotes and record references omitted.]

We cannot find the statement within the quoted portion of the motion that the amount of the settlement in the Magdaleno matter was reasonable as to Ameriflow alone.

[15]Ameriflow also pleaded a theory of mitigation damages but did not argue in its brief for that theory as a basis of recovery.

whether the terms of the RKI/Crescent MSA provides for indemnification or whether Ameriflow proved its damages. Instead, neither of these equity-based doctrines apply to Ameriflow and Crescent's law-based claims for breach of contract.

The elements of equitable subrogation are outlined by the Texas Supreme Court as follows:

> The doctrine of equitable subrogation allows a party who would otherwise lack standing to step into the shoes of and pursue the claims belonging to a party with standing. Texas courts interpret this doctrine liberally. Although the doctrine most often arises in the insurance context, equitable subrogation applies "in every instance in which one person, not acting voluntarily, has paid a debt for which another was primarily liable and which in equity should have been paid by the latter." Thus, a party seeking equitable subrogation must show it involuntarily paid a debt primarily owed by another in a situation that favors equitable relief.

*Frymire Eng'g Co. ex rel. Liberty Mut. Ins. Co. v. Jomar Int'l, Ltd.*, 259 S.W.3d 140, 142 (Tex. 2008) (footnotes omitted).

Though the definition of equitable subrogation is broadly phrased, the fact remains that it is an equity-based doctrine. As the supreme court has noted, "[w]e generally adhere to the maxim that 'equity follows the law,' which requires equitable doctrines to conform to contractual . . . mandates, not the other way around." *Fortis Benefits v. Cantu*, 234 S.W.3d 642, 648 (Tex. 2007). Thus, "[w]here a valid contract prescribes particular remedies or imposes particular obligations, equity generally must yield unless the contract violates positive law or offends public policy." *Id.* at 648–49.

The very phrasing of Ameriflow and Crescent's argument acknowledges that their claim is not one of equity but a claim grounded in the legal claim of breach of contract:

> Because Ameriflow and Crescent had to defend the lawsuits and settle [the] Magdaleno [suit] because of RKI's breach of the MSAs, there was no voluntary payment[,] and Appellees were properly awarded damages for reimbursement from RKI for all expenses, costs, and fees including the settlement payment in the Magdaleno lawsuit. *RKI would have been primarily responsible for all these costs had it complied with its duties under the MSA and provided indemnification as discussed above.* [Emphasis added.] [Record reference omitted.]

In essence, the proposition advocated for by Ameriflow and Crescent is that it is inequitable for RKI not to perform its contract. Such a claim can be resolved by applying legal principles without the need for the intervention of equity.

Ameriflow and Crescent's attempt to rely on the doctrine of quantum meruit is equally circular. The elements of quantum meruit and the fact that it generally is not available as a remedy when the parties have entered into an express contract is noted in the following quote:

> Quantum meruit implies a contract in circumstances where the parties neglected to form one, but equity nonetheless requires payment for beneficial services rendered and knowingly accepted. *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 740 (Tex. 2005)[ (orig. proceeding)]. As a result, "[a] party generally cannot recover under quantum meruit where there is a valid contract covering the services or materials furnished." *Id.* "The rationale behind this rule [known as the express-contract rule] is that parties should be bound by their express agreements, and recovery under an equitable theory is generally inconsistent with an express agreement [that] already addresses the matter." *Dardas v. Fleming, Hovenkamp & Grayson, P.C.*, 194 S.W.3d 603, 620–21 (Tex. App.—Houston [14th Dist.] 2006, pet. denied).

*MMR Constructors, Inc. v. Dow Chem. Co.*, No. 01-19-00039-CV, 2020 WL 7062325, at

*10 (Tex. App.—Houston [1st Dist.] Dec. 3, 2020, no pet.) (mem. op.).

Ameriflow and Crescent note that there are exceptions to the bar of bringing a

quantum meruit claim in the face of an express agreement. The First Court of

Appeals also outlined those exceptions as follows:

> The Supreme Court of Texas has recognized only three exceptions to
> the general rule that an express contract bars recovery under quantum
> meruit. First, recovery may be permitted "when a plaintiff has partially
> performed an express contract but, because of the defendant's breach,
> the plaintiff is prevented from completing the contract." *Truly v. Austin*,
> 744 S.W.2d 934, 936 (Tex. 1988) (emphasis in original). Second,
> "[r]ecovery in quantum meruit is sometimes permitted when a plaintiff
> partially performs an express contract that is unilateral in nature." *Id.* at
> 937. And finally, a breaching plaintiff in a construction contract can
> recover the reasonable value of services less any damages suffered by the
> defendant if the defendant accepts and retains the benefits arising as a
> direct result of the plaintiff's partial performance. *Id.* Each of these
> exceptions allows for recovery in quantum meruit only in situations in
> which the plaintiff partially, rather than fully, performed its obligations
> under the contract. *See id.* at 936–37.

*Id.* at *11.

After making a general reference to the exceptions, Appellees' brief makes no

effort to explain how these exceptions apply to their claims but states only that

> [t]o the extent RKI alleges that the MSA does not cover the issues raised
> in the lawsuit, Appellees are entitled to recover under a quantum meruit
> and/or unjust[-]enrichment theory as RKI accepted and retained the
> benefits of the settlements procured by RKI and payment of the same
> by Appellees.

Left unexplained in this statement is—if the MSA did not provide indemnity—what

the nature of Ameriflow and Crescent's right to recovery would be and how an

implied obligation to indemnify in the absence of an express agreement to do so would have arisen. Further, Appellees' brief makes the claim that the damages sought are the legal measure for a breach-of-contract claim. How that measure should be transformed into a claim for the measure applied to an unjust-enrichment claim based on reasonable value is also unexplained. *See Hill v. Shamoun & Norman, LLP*, 544 S.W.3d 724, 733 (Tex. 2018) ("The measure of damages for recovery under a quantum[ ]meruit theory is the reasonable value of the work performed and the materials furnished.").[16]

Ameriflow and Crescent's arguments do not persuade us why they have a viable basis to invoke equitable remedies in a breach-of-contract case.

Accordingly, we sustain RKI's second issue raising segregation arguments.

## F. We reverse and remand the awards of attorneys' fees to Ameriflow and Crescent for reconsideration in light of our holdings.

In its third issue, RKI challenges Ameriflow's and Crescent's attorneys' fee recoveries both for fees incurred in the Magdaleno and De La Hoya litigation and for fees awarded to prosecute the present case and for appeal in this case. Based on our

---

[16]RKI notes that Crescent moved for summary judgment on the ground of quasi-estoppel. The basis for Crescent's quasi-estoppel claim is that RKI admitted an indemnity obligation to Ameriflow and that position in some way estops it to deny an indemnity obligation to Crescent. RKI argues that it has consistently denied that it owed indemnity to Crescent; thus, RKI has taken no inconsistent position that might create an estoppel. *See Lindley v. McKnight*, 349 S.W.3d 113, 131 (Tex. App.—Fort Worth 2011, no pet.) ("Quasi-estoppel is an affirmative defense that precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken."). Crescent does not respond to RKI's argument. We conclude that an indemnity recovery by Crescent cannot be supported by the doctrine of quasi-estoppel.

disposition of the prior issues, we sustain RKI's third issue and remand the attorneys' fee awards as explained below.

With respect to Ameriflow's and Crescent's fee recoveries for the defense and prosecution of the present case, as we are reversing and remanding this matter to the trial court, we also reverse the award for attorneys' fees of $254,311.62 to Ameriflow and of $131,623.48 to Crescent and the appellate-fee awards,[17] and we remand the fee awards for further consideration. *See Friedman v. Atl. Funding Corp.*, 936 S.W.2d 38, 42 (Tex. App.—San Antonio 1996, no writ) ("Since we hold that the trial court improperly granted [appellee's] summary judgment, we also reverse the trial court's award of attorney's fees.").

With respect to the joint fee recoveries by Ameriflow and Crescent for their attorneys' fees and expenses in the Magdaleno and De La Hoya suits, we reverse and remand those awards as well. As a result of our holdings, the liability of RKI to Crescent for indemnity remains an open question, and as presently postured, Crescent's fee claim is tied to its right to indemnity.[18]

---

[17]It is concerning, as noted in RKI's brief, that Ameriflow asked for and proved up only $15,000 for the Texas Supreme Court briefing stage, but the judgment awarded $50,000.

[18]In their brief, Ameriflow and Crescent mention Section 8.11's provision that provides, "Any defense and indemnity by either party under these provisions shall include, but not be limited to, all expenses of litigation, court costs, and reasonable attorney[s'] fees that may be incurred by or assessed against the party being indemnified." As phrased, the argument in Appellees' brief does not appear to be that Ameriflow and Crescent are entitled to recover their defense costs, no matter the

71

## IV. Conclusion

We have sustained RKI's three issues on appeal. We have concluded that the trial court's interpretation of the scope of indemnity in the RKI/Crescent MSA was too broad and that the scope was tied to the performance required under the MSA. That said, however, the state of the record in this matter does not enable us to decide as a matter of law that Crescent is not entitled to indemnity. We are also not persuaded that Ameriflow and Crescent's arguments, several of which were not grounds raised below, establish as a matter of law that Crescent may recover from RKI, no matter whether Crescent has a right to indemnity under its MSA or not. Based on the disposition of the indemnity and segregation arguments, we have concluded that the attorneys' fee awards cannot stand. Thus, we reverse the final judgment of the trial court signed on September 2, 2020, and we remand this matter to the trial court.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered: June 23, 2022

---

outcome of the indemnity issues. As RKI points out, Ameriflow and Crescent's third amended motion for summary judgment on damages appears to tie the recovery for fees and expenses to the ability to recover indemnity. Thus, in our view, neither a summary-judgment ground nor an argument is presented that a joint award of fees and expenses can stand even if Crescent lacked a right to indemnity.